GARLOCK v. HILLIARD, 2001 NCBC 10

**STATE OF NORTH CAROLINA**

**COUNTY OF MECKLENBURG**

**IN THE GENERAL COURT OF JUSTICE**
**SUPERIOR COURT DIVISION**
**00-CVS-01018**

TAMMY L. GARLOCK, JUDITH L. JACOBS
and RALPH W. JOHNSON,

        **Plaintiffs,**

    **v.**

SOUTHEASTERN GAS & POWER, INC., and
AUBREY L. HILLIARD,

        **Defendants.**

**OPINION AND ORDER**

{1}    This matter came on for trial before the undersigned without a jury at the October 8, 2001 civil session of the Mecklenburg County Superior Court. The Court makes the Findings of Fact and Conclusions of Law set forth below. Judgment is entered ordering dissolution of Southeastern Gas & Power, Inc. pursuant to N.C.G.S. § 55-14-30(2)(ii) subject to the corporation's rights under N.C.G.S. § 55-14-31(d) to purchase the shares of the minority shareholders at fair value, which the Court has determined to be $240 per share or a total of $936,000.

     *Bishop, Capitano & Abner, P.A., by J. Daniel Bishop and A. Todd Capitano, for plaintiffs.*

     *Andresen & Associates, by Kenneth P. Andresen and Christopher M. Vann, for defendants.*

**I.**

**FINDINGS OF FACT**

{2}    Plaintiffs Tammy L. Garlock, Judith L. Jacobs, and Ralph W. Johnson are citizens and residents of Mecklenburg County, North Carolina. Defendant Aubrey L. Hilliard is a citizen and resident of Mecklenburg County, North Carolina. Southeastern Gas & Power, Inc. ("Southeastern") is a North Carolina corporation with an office and principal place of business in Mecklenburg County.

{3}    In early 1997, plaintiffs and Aubrey L. Hilliard began discussing forming a company to market natural gas to industrial customers and municipalities in the southeastern United States. All four of these individuals were then employed in the Charlotte office of a Texas-based gas marketing firm, El Paso Energy. Hilliard was a salesman and marketer for the Carolinas and Virginia. He had between 70 and 80 customers. Plaintiff Garlock was risk manager, administering clients' natural gas futures

positions. Plaintiff Jacobs was an operations manager. Plaintiff Johnson was director of operations and managing agent of the office. All had substantial tenure and experience in their respective positions in the natural gas marketing industry. Garlock, Jacobs, and Johnson are collectively referred to as "plaintiffs."

{4}     A natural gas marketing company is an intermediary which works to meet the supply and pricing needs for natural gas of commercial, industrial, and municipal customers who have contracted with the company for it to meet their gas needs rather than their local gas utility. Natural gas is transported through interstate pipelines and then delivered to consumers by local distribution companies (LDCs). Most of the gas shipped to North Carolina comes through the Transco Pipeline, an 1,832 mile pipeline which runs from the Gulf Coast of Texas up the east coast to New York City.

{5}     In the 1980s, the distribution and sale of natural gas was deregulated to increase competition. Before deregulation, LDCs were the exclusive suppliers and transporters of gas to customers. After deregulation, consumers could purchase gas directly from producers, pipelines, LDCs and marketing companies. Recently, the price of natural gas has been volatile. Marketing companies, such as Southeastern, are able to use this volatility to their advantage in that they can use hedging to offer a better price to their customers than the LDCs, which price gas by the use of stated tariffs that do not change as frequently. A marketing company, however, cannot sell to all potential users of natural gas because the LDCs set minimum limits for the volume of gas demand a client must have in order to purchase gas from other entities. This practice has the effect of prohibiting very small commercial, industrial, and institutional users from shopping for gas and using marketing companies.

{6}     El Paso was restructuring its retail gas marketing operations, such that Hilliard and the plaintiffs were prompted to consider alternative business and employment opportunities. There was a distinct possibility that El Paso would relocate back office customer support functions to Houston, Texas. Johnson met in April 1997 in Texas with a representative of Fina Natural Gas Co. ("Fina") to discuss terms for an agency agreement under which a new venture would market natural gas on Fina's behalf. Shortly thereafter Hilliard became involved in the discussions with Fina, which ultimately progressed to the point of agreement. Hilliard also had discussions to which plaintiffs were not privy with other companies and individuals concerning his future.

{7}     Plaintiffs and Hilliard discussed seriously the formation of a corporation in late summer and fall 1997. On the strength of his customer contacts, Hilliard negotiated with plaintiffs to own 50 percent of the equity of the company to be formed, plus another 10 percent which he represented would be used either to provide incentives to future sales employees or to share with Hilliard's long-time friend

and gas commodity market pricing consultant, Larry Marshall. For even divisibility of the minority shares, it was agreed that Hilliard would receive 61 percent of the stock, and the remaining 39 percent would be evenly divided (13 percent each) among plaintiffs. Hilliard or those selected by him would control a majority of the voting stock of the corporation.

{8}     Plaintiffs and Hilliard jointly made various formative operating decisions concerning the proposed business, including its name, Southeastern Gas & Power, Inc. Hilliard arranged for a lawyer to incorporate Southeastern on October 2, 1997. Hilliard was designated in the articles of incorporation as the sole initial director "until the first meeting of shareholders." Of the plaintiffs, only Johnson may have seen the articles of incorporation, and he attached no particular significance to Hilliard's designation as sole director because it appeared to be a temporary condition and because of the other circumstances described herein. The parties had no discussion or agreement concerning Hilliard being the sole director on an ongoing basis.

{9}     Each of the plaintiffs expected that he or she would participate actively in the management of the business of Southeastern, and Hilliard knew and concurred in this expectation. All four shareholders contemplated that they would all be employed by Southeastern in roles substantially equivalent to their pre-existing employment by El Paso.

{10}     In late November 1997, plaintiffs and Hilliard agreed to a specific methodology for allocating among them the expected earnings of Southeastern. As set forth in a written pro forma spreadsheet, the individual parties agreed that of the 70 percent of margins to be earned by Southeastern on any gas sales (after Fina's take of 30 percent), 50 percent would be allocated to Hilliard's sales department. The remaining 20 percent would be allocated to the plaintiffs, through the financial and operations departments, which they operated. Any revenues from "agency fees" earned for providing natural gas operations services for municipalities would be allocated solely to the financial and operations departments. General and administrative expenses were allocated 25 percent to each shareholder. Under this arrangement, the sales department was responsible for all expenses incurred in developing customer contacts; any revenues generated, however, were distributed among the shareholders.

{11}     Plaintiffs and Hilliard capitalized Southeastern in November and December 1997. Hilliard contributed $30,000; plaintiffs contributed $6,393 each. The contributions were proportional to the equity interests to be granted each shareholder. Hilliard testified that plaintiffs' stock ownership was meant to insure that they would get a share of the value of the company when it was sold.

{12}     Share certificates were prepared and issued to reflect the issuance of 6,100 shares to Hilliard and 1,300 shares each to the plaintiffs. The shares reflected in such certificates are validly issued and

outstanding, such that Hilliard holds 61 percent and each plaintiff 13 percent of the shares of Southeastern. Hilliard has never used the extra 11 percent of stock he received as either incentives to sales employees or for transfer to Marshall.

{13} All of the individual parties were made officers of Southeastern. Hilliard became chairman of the board of directors and CEO. Johnson became president. Garlock became vice president. Jacobs became secretary/treasurer.

{14} On October 2, 1997, the articles of incorporation for Southeastern were filed with the secretary of state. In December 1997, the parties resigned from El Paso. The parties had agreed with El Paso to take over its office space in Charlotte. On January 1, 1998, the shareholders received their shares, and Southeastern was opened for business.

{15} In the final two months of 1997, the shareholders busily prepared for Southeastern to commence business in January 1998. As they did so, they were all aware that Hilliard had pleaded guilty to and been convicted of federal income tax fraud and might be ordered to report to federal prison at an indefinite date. Hilliard expected and advised the plaintiffs that he could be incarcerated for four and a half months, but he hoped to avoid prison entirely through alternative punishment. As a precaution, Hilliard got his customers to sign contracts longer than his expected prison sentence so that he would be out of jail when the time came to renew the contracts.

{16} Thus, when the business was formed, there was a mutual dependence between plaintiffs and Hilliard. Each was to benefit from formation of the business. Plaintiffs had employment in a business with which they were experienced, and they had the opportunity to make more money than they were making with El Paso. All three faced the possibility of unemployment when El Paso closed its Charlotte office. By forming Southeastern with Hilliard they got the benefit of his customer base and the possibility of cashing out their equity interest at a substantial profit if the business was successful. It is unlikely that they would have had a similar opportunity without Hilliard's involvement and customer base. For Hilliard, the formation of the business was a unique opportunity. He was also facing the possibility of obtaining new employment, but at a time when he faced an active prison sentence. Not only would Southeastern provide him guaranteed employment the day he got out of prison, it would provide him substantial income while he was incarcerated. The original deal agreed to by all the parties was beneficial to everyone, and each provided consideration for his or her part. The four participants had not only an "expectation" but also an agreement with respect to their employment, their duties, and their share of the profits and expenses. It worked well for all of them.

{17} Southeastern is an intermediary and does not actually sell the natural gas. While Southeastern

handled all customer services, including invoicing and transportation, the gas contracts are between Southeastern's customers and Fina. The customer sent its payment to Fina, and Fina paid Southeastern its 70 percent share of the net margins.

{18} Southeastern began selling gas on behalf of Fina on January 1, 1998. All of the individual parties became employed by Southeastern at that time. Within days of Southeastern's commencement of operations, Hilliard informed plaintiffs that he was required to report to Seymour Johnson Federal Prison Camp to begin serving his prison sentence. Hilliard reported to prison on January 23, 1998.

{19} Hilliard's expectations concerning the duration of his imprisonment were disappointed. Instead of serving no active time or serving only four and a half months, Hilliard served over eight months in the penitentiary, being released in October 1998. In the interim, plaintiffs and Southeastern's other two employees undertook and performed Hilliard's essential sales duties, with such guidance and assistance as Hilliard could provide from prison. Despite Hilliard's extended absence, Southeastern thrived, earning revenues in excess of $1 million in 1998. Remarkably, the parties were able to hide Hilliard's imprisonment from most, if not all, of Southeastern's customers.

{20} While Hilliard was in prison, he telephoned Southeastern almost daily and wrote letters to Garlock, Jacobs and Johnson twice a week. He asked Larry Marshall to visit Southeastern on occasion and assist Garlock, Jacobs, and Johnson with the business. Initially, Hilliard contemplated giving Marshall a 10 percent interest in the company, but that transaction was never finalized. Marshall made several trips to Charlotte to assist Garlock, Jacobs, and Johnson while Hilliard was in prison.

{21} From the beginning of Southeastern's operations, Plaintiff Johnson oversaw the corporation's gas accounting function as well as its internal financial accounting. This was consistent with all of the shareholders' expectations, including Hilliard's. It was particularly important to the minority shareholders that Johnson have control of accounting because of Hilliard's tax problems and his 1990 bankruptcy. By his own admission, Hilliard is not a "detail" person. On a monthly basis, Johnson prepared and circulated to all shareholders a detailed report of the distribution of the corporation's earnings according to their agreement.[1] Johnson sent Hilliard's monthly reports to him in prison. Each shareholder, including Hilliard, regularly received monthly payments of his or her share of Southeastern's earnings. As a consequence of his extended stay in prison, Hilliard agreed to reallocate a portion of his share of earnings to plaintiffs, other employees and Marshall, as compensation for their additional duties.

{22}     Before and during Hilliard's prison term, Southeastern ran very much by consensus of the four shareholders, without significant attention paid to titles or official sources of corporate authority. The shareholders, including Hilliard in letters from prison, referred to each other as "partners," reflecting the existence of notions of shared control and management common to closely held corporations and consistent with their agreement for sharing the profits of the business.

{23}     After Hilliard's return from prison in October 1998, the atmosphere at Southeastern initially remained much the same. There was a reasonable level of trust and mutual respect among the parties. In November 1998, the four shareholders considered and approved a proposal by Plaintiff Jacobs to alter the formula for allocating general and administrative expenses among the departments in a manner that favored plaintiffs. Hilliard was reluctant to agree, but his reluctance was overcome in part by Jacobs' reminding him that he had suggested in writing such a reallocation while he was in prison due to unanticipated developments in Southeastern's business. This event sparked a measure of animosity between Hilliard and Jacobs.

{24}     In December 1998, the four shareholders acted to consider and declare a small year-end dividend. Their agreement with respect to sharing income was unaffected by this action.

{25}     In January 1999 Hilliard delivered to plaintiffs a proposed shareholders agreement. The proposed shareholders agreement contained provisions which were cause for concern for the minority shareholders. Among other things, it granted the corporation and Hilliard rights to repurchase for book value, or the original, nominal subscription price, the shares of any minority holder whose employment by the corporation terminated or who sought to transfer such shares. It imposed no reciprocal limitations on Hilliard. The proposed agreement also expressly disclaimed the minority's expectations of continued employment, value of their shares, financial benefits of share ownership, fringe benefits, and management participation—except as set forth in the agreement.

{26}     Each of the shareholders clearly expected from the inception of the corporation to participate in a terminal value of Southeastern through a future sale. In a letter from prison, Hilliard himself encouraged the plaintiffs to consider what they would receive from a sale of Southeastern within two or three years. Hilliard believed that a "convergence" of electrical and natural gas utilities would occur in three to five years following the organization of Southeastern, placing Southeastern in a position to be acquired by a larger company. This opportunity arose sooner than Hilliard expected.

{27}     In the first week of January 1999, DukeSolutions, Inc. ("DukeSolutions") contacted Hilliard to express interest in acquiring Southeastern. Hilliard did not immediately disclose DukeSolutions' interest to the plaintiffs. The proposed shareholder agreement, if executed, would have materially

impaired the plaintiffs' rights that otherwise would have existed in the face of a potential DukeSolutions offer. Plaintiffs learned of the DukeSolutions initiative from a source outside the corporation rather than from Hilliard—a fact which would ultimately prompt suspicion about Hilliard's motives.

{28}    Plaintiffs, believing the provisions of the proposed shareholders agreement were unbalanced, expressed those views to Hilliard. Hilliard thereafter obtained and proposed another draft with very little change. Plaintiffs decided not to sign it, preferring the status quo. The issue was dropped as a result of DukeSolutions' interest in buying the business.

{29}    After the DukeSolutions initiative was disclosed by Hilliard, plaintiffs participated in assisting DukeSolutions' due diligence review. In March 1999, DukeSolutions tendered to the shareholders of Southeastern a letter of intent proposing to acquire the stock of the corporation for total purchase consideration of $5.48 million, subject to conditions. Hilliard and the minority shareholders considered together DukeSolutions' offer and unanimously rejected it as inadequate. Hilliard's reasoning for rejecting the offer was documented in a letter to counsel for the corporation wherein Hilliard detailed his expectations to "pay myself" $450,000 in 1999; $600,000 in 2000; $650,000 to $700,000 in 2001; $750,000 in 2002; $1 million in 2003; and to sell the business in 2003 for $8 million to $10 million.

{30}    When the DukeSolutions offer was rejected, Hilliard realized that if his expectations were to be realized, Southeastern had to grow. This situation posed a dilemma for Hilliard. The original agreement entered into by the four shareholders/employees covering distribution of corporate income and allocation of expense was not conducive to the promotion of growth and required that Hilliard bear a larger part of the cost of expanding the sales force than he believed reasonable. The arrangement which had worked well under the circumstances existing at the start of the company now chaffed him and posed serious problems for growth. The expenses associated with sales growth would come out of Hilliard's share of revenues, and the minority shareholders would benefit by sharing in the income once the initial costs of expansion were overrun by increased sales revenue.

{31}    A further irritant to Hilliard was the failure of Johnson and Jacobs to develop business with municipalities. Johnson had believed he could bring at least seven municipalities that were customers of El Paso to Southeastern. Johnson and Jacobs were to provide service to those municipalities and retain the income from the services performed. Hilliard would have benefited from the opportunity to market gas to the industrial customers of the municipalities. Johnson and Jacobs, however, were not successful in developing the municipal business. Hilliard believed that without the municipal business

Jacobs did not have enough work for a full-time job.

{32}   The relationships between the parties were further complicated as the business became more successful.  The more successful Hilliard was as a salesman, the more money plaintiffs made under their revenue sharing arrangement.  Plaintiffs' compensation thus came to exceed by significant margins the amount normally paid to employees in their positions in comparable companies.  The work they performed could be done by others for less.  Again, the original agreement that worked well for everyone at the outset now caused strains in the relationship.

{33}   Thus, in the summer of 1999, the parties found themselves in a situation in which Hilliard owned a majority of the stock in a corporation which was run more like a partnership because of the original agreement concerning allocation of income, expenses, and duties.  The business had been more successful than anticipated.  Everyone's expectations had been raised by the DukeSolutions offer.  Hilliard's sales abilities were key to the continued growth, but he had given up most of his leverage in the original agreement to insure his continued income while in prison and the guarantee of a well paying job when he was released.   Plaintiffs had worked hard to keep the business going while Hilliard was incarcerated; they had performed their duties well and had benefited substantially by the original agreement.  They were all faring far better than they had at El Paso.  They had become a closely knit group.  In order for the company to continue to grow and become an attractive acquisition target, some change in the original agreement was going to be necessary.

{34}   It was at that point that the parties failed to do what was needed to preserve the relationship from which they had all benefited.  Suspicion replaced trust: the resulting relationship fettered communication with Hilliard, and the parties consequently failed to address the difficult issues they faced in a meaningful, straightforward way.

{35}   In early summer 1999, Hilliard mentioned to Plaintiff Garlock that he was considering a stock incentive plan as a device to dilute Jacobs' ownership interest in the corporation.  In August, Hilliard lunched with Johnson and suggested that Jacobs should be terminated in order to pay Johnson more money.  Johnson demurred.  Hilliard separately approached Garlock and suggested a reduction in Jacobs' role and compensation.  In late August or early September, Hilliard approached Jacobs and told her that he intended to reduce her employment to part time and cut her compensation from approximately $140,000 to $24,000 annually.  Jacobs informed Hilliard that any such discussions needed to include Johnson and Garlock, and the three of them objected to Hilliard's plan.  Hilliard appeared to acquiesce in the minority's objections to the reduction of the scope of Jacobs' employment and alteration of the compensation agreement.

{36}    Next plaintiffs learned that Hilliard had arranged for several existing and prospective employees to attend training in Texas to perform the operations responsibilities of Plaintiffs Johnson and Jacobs. He then told plaintiffs he had decided to shift accounting functions to an outside accountant, chosen by him. They were required to make any requests for accounting information through Hilliard. The outside accountant lacked the specialized knowledge of gas accounting possessed by Johnson, and the operations personnel identified to replace Johnson and Jacobs not only lacked substantial experience and but also increased the corporation's fixed salary expense. To plaintiffs, Hilliard's actions had the apparent aim of effecting a transition which would lead to the termination of Johnson and Jacobs. Their fears were not unreasonable.

{37}    At approximately the same time plaintiffs learned about the training of prospective operations employees, they also discovered that Hilliard had caused or allowed counsel to file a charter for a limited liability corporation named SEG&P, LLC and had prepared contract forms in the name Southeastern Gas & Power, LLC. This revelation occurred when Jacobs opened mail addressed to Hilliard from the corporation's counsel. Concerned about the corporate opportunity implications, plaintiffs demanded through counsel an explanation for the formation of the LLC. The corporation's lawyer (who had dealt exclusively with Hilliard) explained that the LLC was formed for tax advantages and for a reason related to contract renegotiations with Fina, but that it had not been "activated." The corporation's lawyer simultaneously announced that employment agreements would be drafted for execution by all shareholders by mid-November 1999. Plaintiffs were unsatisfied by the explanation given. The new entity was never activated in that it never received funding or revenues.

{38}    Hilliard did not inform the other parties about the LLC until after it was formed. Garlock, however, did not believe Hilliard's explanation and began searching the company's server for other LLC-related documents. She found a customer contract and a confidentiality agreement in the name of SEG&P, LLC instead of Southeastern. There is no evidence, however, that any business or money was transferred from Southeastern to SEG&P, LLC. There is no evidence that any revenues were diverted from Southeastern to SEG&P, LLC.

{39}    By November 1999, the minority shareholders were deeply distrustful of Hilliard, and he was dismissive of them. The relationships among them were deeply fractured.

{40}    In late November 1999, Hilliard proposed written employment agreements to plaintiffs. The agreements proposed were disadvantageous to plaintiffs and would have eliminated the clear expectations plaintiffs held when the business was organized. The proposed agreements granted the

corporation the right to terminate the minority shareholders' employment upon sixty days' notice and to repurchase their shares upon such termination for double their book value (a nominal amount, particularly given the DukeSolutions offer that same year) and made such purchase consideration the minority's "sole and exclusive remedy against the Employer, its directors, officers, shareholders, and employees." Plaintiffs rejected the agreements after providing detailed comments concerning unacceptable features. Hilliard did not propose any further draft but instead, on December 6, 1999, delivered to Jacobs and Johnson written terms for their further employment—drastically different from the circumstances of their employment to that point—and an ultimatum that the terms be accepted by December 10, 1999, or their employment be terminated. Jacobs and Johnson refused the terms. On December 10, 1999, Hilliard arrived at Southeastern's offices with security guards to escort Jacobs and Johnson out.

{41}     During the late fall, the parties communicated with each other only by e-mail. Their lawyers exchanged letters with pointed barbs which only served to heighten the existing tensions. Neither the parties nor their counsel met to discuss resolution. Neither side made a constructive proposal to the other. They retreated to their respective bunkers.

{42}     Shortly after Jacobs and Johnson were escorted out, Garlock gave notice that she considered her employment to have been constructively terminated and demanded that Hilliard reinstate Johnson and Jacobs. Garlock had not been given the same ultimatum as Johnson and Jacobs. Her work had been highly supportive of Hilliard and he referred to her as his "Girl Friday." Garlock was left in the position that the original understanding of the parties had been unilaterally abrogated, and she had no protection for her expectations.

{43}     Although Hilliard insisted that Southeastern's best interests required all shareholders to execute non-compete agreements and demanded that the minority shareholders do so, Hilliard has never signed any such agreement.

{44}     Thus in December 1999 the situation of Southeastern was such that Hilliard, although owning a majority of the stock, had agreed to an allocation of income, expenses and duties which severely limited his power and his flexibility to grow the business. The minority shareholders were threatened and defensive and accordingly not anxious to change the status quo. Hilliard took it upon himself to alter the status quo. In doing so he abrogated the agreements the parties had entered into when organizing the business. To that extent the Court concludes that any "fault" required by the statute to support dissolution resides with Hilliard and that the abrogation of the original agreement and expectations was not the fault of plaintiffs. They may be subject to criticism for lack of flexibility in

resolving the stalemate which existed, but they were not required to give up that for which they had negotiated when setting up the business.

{45}     Since the termination of plaintiffs' employment, they have been excluded from any meaningful involvement in the business and affairs of the corporation.  No dividends have been paid.

{46}     Southeastern's business, however, continues to thrive.  The current, annualized pro forma revenues (margins) of Southeastern, based on available recent information, are $2.4 million.  Hilliard has caused the corporation to pay him compensation in the amounts of $436,088[2] in the year 2000 and $674,559 through September 25, 2001.  Not included in these compensation figures are substantial amounts spent by the company to defend Hilliard in this litigation.  Included are amounts of past due compensation.

{47}     After the termination of plaintiffs' employment, they sought unpaid compensation alleged to be due.  Hilliard caused the corporation to litigate this claim at length, contending that plaintiffs were overpaid and owed the corporation at least $17,000.  The plaintiffs' compensation claims were referred to a referee and resolved through settlement after his report was filed.  The report concluded that the corporation owed plaintiffs unpaid compensation of $156,562 and that Hilliard was owed unpaid compensation of $269,106.

{48}     In its initial and amended pleadings in this action, filed in spring 2000, Southeastern elected to buy back plaintiffs' shares for their fair value, as provided by N.C.G.S. § 55-14-31(d).  On the basis of this election, the parties stipulated to and the Court appointed a joint valuation expert, Mr. George Hawkins.  In April 2001, the expert rendered to the parties a tentative valuation report which opined that the fair market value of Southeastern at the date plaintiffs' employment ceased was over $2.4 million ($946,764 as the pro rata value of the minority's 39 percent share).  Shortly after the issuance of the draft report, Southeastern attempted to unilaterally withdraw its election to buy out the plaintiffs by notice filed in the cause.  After the Court struck plaintiffs' notice as an improper filing, Southeastern moved to be allowed to amend its pleadings to withdraw its election.  The motion was filed on August 30, 2001, less than 45 days before trial.  The Court allowed the motion but recognized that the withdrawal was undoubtedly prompted by the issuance of a valuation opinion unsatisfactory to Hilliard.

{49}     As a result of the change in position by Hilliard and the corporation, on September 24, 2001, the Court ordered Southeastern to provide certain current financial information to plaintiffs.  That information revealed that on the day of the order and the following day, approximately two weeks before trial, Hilliard caused Southeastern to pay him $295,650.  The information also revealed that the

corporation had cash at that time of over $400,000. Testimony of the corporation's accountant, Jack Heil, indicated that Hilliard has caused Southeastern to pay himself additional amounts since September 25 and that Hilliard's payments of compensation are erratic and not regularized.

{50} Southeastern has considerable prospects for future business based on existing relationships with its customers. Evidence produced by Southeastern during the trial demonstrated that the corporation has arranged gas futures strips for customers extending as long as summer 2004. Substantial volumes are contracted through the first quarter 2002.

{51} Hilliard has caused Southeastern to sign contracts with three financial partners who collectively have replaced Fina. The contracts vary significantly in their terms, having been drafted independently by the three financial partners. Significantly, Hilliard personally drafted for each contract a virtually identical provision allowing the partners to terminate their contracts should Hilliard lose control of Southeastern. Those contracts will terminate if Southeastern is dissolved.

{52} Southeastern's customers contract directly with the financial partners. Most of Southeastern's customer business is with Texican, the financial partner that pays the lowest share of revenues to Southeastern.

{53} It is possible that Hilliard has positioned Southeastern so that he can effectively transfer its customer base for his own benefit in the event of an adverse outcome in this action.

{54} Under the current situation, it is highly unlikely that plaintiffs' shares in Southeastern can ever be sold for their fair market value, thus depriving them of one of their original expectations. Accordingly, plaintiffs' investment is effectively and indefinitely imprisoned within the corporation to the benefit of Hilliard and to the detriment of plaintiffs. Due to Hilliard's exclusive control of Southeastern and the high cost and limited effectiveness of continued efforts to monitor the corporation's business, plaintiffs are less likely to be able to protect the value of their investment as time goes on.

{55} Plaintiffs, owning 39 percent of Southeastern, had certain reasonable expectations which are set forth below. These reasonable expectations, which were known by Hilliard and have been frustrated without the fault of the complaining minority shareholders, include:

    a) employment by the corporation in their traditional departmental roles with substantial autonomy over their respective departmental functions;

    b) meaningful participation in the management of Southeastern;

    c) access to financial and business records of the corporation;

    d) sharing of the earnings of the corporation substantially in the fashion of the original earnings distribution pro forma; and

    e) pro rata participation in the terminal value of Southeastern through an eventual sale of the

business.

{56}    Southeastern has three and a half employees other than Hilliard, all of whom became employed after plaintiffs' ouster. Southeastern serves over 100 industrial gas retail customers and appears to function with three suppliers or credit facilitators.

## II.

### OPINION AND CONCLUSIONS OF LAW

{57}    Based on the foregoing Findings of Fact, the Court must determine two issues as a matter of law. First, the Court must determine whether plaintiffs have established that their rights and interests as shareholders have been contravened and that, balancing all of the interests involved, the Court should order the corporation dissolved pursuant to N.C.G.S. § 55-14-30(2)(ii). If the Court so orders, N.C.G.S. § 55-14-31(d) provides that the corporation has the right to avoid dissolution by purchasing the complaining minority shareholders' shares at "fair value" as determined by the Court. The determination of fair value is the second issue which the Court will address.

{58}    The analysis which must be applied by the trial court in determining whether a complaining minority shareholder is entitled to involuntary dissolution or to alternative relief is set forth in *Royals v. Piedmont Electric Repair Co.*, 1999 NCBC 1, *affirmed*, 137 N.C. App. 700, 529 S.E.2d 515, *disc. rev. denied*, 352 N.C. 357, 544 S.E.2d 548 (2000). That determination in the factual context of this case is quite clear and straightforward. The Court has considered the factors set forth below in reaching its decision on dissolution.

{59}    *The nature of the dispute between the shareholders.* In this particular case, the original agreement between the parties has a significant impact on the Court's decision. The minority shareholders had not only specific expectations but also express agreements with respect to their continued employment, the allocation of management responsibilities and the division of profits of the company. Hilliard acknowledges the agreement and recognizes that the conduct of the parties was consistent with that agreement until the fall of 1999. The allocation of management responsibility, particularly the accounting function, was not insignificant given Hilliard's prior bankruptcy and tax fraud conviction.

{60}    When Hilliard exercised his power as the majority shareholder, sole director and chief executive officer to terminate Jacobs and Johnson, he acted in direct contravention of his express agreement with and the clearly understood expectations of the minority shareholders. His actions in removing the accounting function from Johnson likewise violated the understanding and expectations of the parties. The Court need not find that Tammy Garlock was constructively terminated. As a minority shareholder, her expectations and understandings have been rendered unattainable by Hilliard's

actions. The fact that she was not terminated at the same time and in the same manner as Johnson and Jacobs is irrelevant. Any assurance that she thought she had with respect to permanent employment, division of profits and allocation of management responsibility among the original shareholders was eliminated in December 1999.

{61} This is not a case in which the Court must divine or imply some expectations or find that the majority shareholder "should have known" about them. These shareholders, both majority and minority, had an express agreement from which each derived some benefit. Hilliard exchanged some control he would normally have had as the largest shareholder for the benefits he received from the plaintiffs' efforts while he was in prison. It was a fair bargain, and one he should not now be allowed to simply ignore. While all the parties would have been better served had they agreed upon written shareholder and employment contracts prior to starting the business, most small business owners do not do so. The minority shareholders were not required to enter into employment agreements or shareholder agreements after Hilliard returned from prison, particularly if those agreements limited or eliminated rights they already possessed. The original structure of the business relationship between the parties created obvious problems for a company which wanted to grow. Growth would come from increased revenues, and the cost of growing sales fell almost entirely on Hilliard. Only time will tell if these shareholders would have been better served by reaching some reconciliation of their differences rather than litigating. However, the restructuring of the original agreements in order to obtain the benefits of growth required negotiation and compromise. The parties were unable to communicate effectively in order to reach some compromise. Hilliard could not then simply take matters into his own hands and unilaterally void the original understanding.

{62} *The nature of the business.* Southeastern is a personal service business. It is primarily dependent for its success on the personal contacts and relationships established by Hilliard. The business is enjoying impressive growth. The liquidation value of the business would be less than the value of the business if sold as an ongoing concern. It has little more than liquidation value, however, if Hilliard is not an employee. Thus all the shareholders will suffer some loss if dissolution is ordered.

{63} *The impact on employees and others.* The company has a very small number of employees who are likely to find employment with Hilliard if he starts a new company. Customers can buy gas on the open market. Because prices are down, customers are not likely to be adversely affected. All the third party financing contracts automatically terminate upon dissolution. The impact upon third parties is likely to be minimal.

{64} *The relationship between the parties.* The relationship of the parties is beyond repair.

{65}     *Corporate actions since September 1999.*  The manner in which the corporate decisions have been made by Hilliard's unilateral exercise of majority power since September 1999 evidences his intent to disregard the clear expectations of the minority shareholders.  They are unlikely to receive any return on their investment unless and until Hilliard decides to sell the company.

{66}     The Court concludes that the business of Southeastern is being conducted to the unfair advantage of the majority shareholder.

{67}     Accordingly, the Court concludes as a matter of law that the combination of the failure of plaintiffs' original expectations and the actions of Hilliard in denying the reasonable expectations of the current minority shareholders, as well as the particular circumstances of this business and its management, warrant this Court's finding that liquidation is both reasonably necessary for the protection of the rights and interests of the minority shareholders and within the Court's discretion and equitable powers to afford the minority shareholders the relief provided by N.C.G.S. § 55-14-30(2)(ii).

{68}     Having made the determination that dissolution is appropriate, the Court next turns to the alternative relief provided to the corporation under N.C.G.S. § 55-14-31.  That statute permits the corporation, at its election, to purchase the shares of the complaining minority shareholders "at their fair value, as determined in accordance with such procedures as the court may provide."  N.C.G.S. § 55-14-31(d).

{69}     The Legislature wisely provided for flexibility in determining fair value. Recognizing that every situation will be different, the Legislature did not limit fair value to market value and did not place any limiting parameters on the factors to be considered in determining fair value.  It recognized that the value of ownership in a small, closely held company could differ markedly from market value.  In taking away the court's ability to provide equitable relief, it did not intend for the court to ignore equitable considerations in setting fair value.  The statutory scheme protects both minority and majority shareholders by providing that the minority can be forced to sell at a fair price considering all the circumstances and the majority can elect to pay that price or dissolve the company.  In its decision in *Royals*, 1999 NCBC 1, this court set out the factors which it had considered in determining fair value.  As a general proposition, the Court considered market value, equitable considerations, practical considerations and changes in condition of the company from the market valuation date.  The Court of Appeals found no fault with that approach. *See Royals,* 137 N.C. App. 700, 529 S.E.2d 515.

{70}     Accordingly, the Court begins its analysis of fair value with a consideration of market value. The valuation of Southeastern was performed under court order and with supervision by Mr. George B. Hawkins of Banister Financial, Inc., an independent experienced expert with outstanding

qualifications.  He prepared a valuation report (the "Banister Valuation") outlining his appraisal of the fair market value of shares in Southeastern.  The parties had an opportunity to meet with the expert and have input in the valuation process. Each side submitted information to the expert, and he carefully considered their submissions. The report was prepared in accordance with the *Business Valuation Standards* of the American Society of Appraisers and the *Uniform Standards of Professional Appraisal Practice*.[3]  The methodology used by the expert was appropriate for this type of business, and it was clearly in the mainstream of valuation methodologies.  The Court finds and concludes that the Banister Valuation is a reliable indicator of market value.

{71}    Specifically, the Court concludes that the expert's use of the income valuation approach was appropriate and his rejection of other methodologies proper in this circumstance. His consideration and rejection of adjustments suggested by both sides was proper. Over the objection of plaintiffs, he used a high market equity risk premium, an approach which had the effect of lowering the value. His use of the higher premium was justified even though DukeSolutions used a lower risk premium in calculation of its bid for Southeastern. It was appropriate for the expert to use the risk premium he believed to be most generally applicable to this type of business and not limit his consideration to one buyer or one type of buyer. The Court notes that he gave some weight to the DukeSolutions offer, thereby giving plaintiffs some benefit of the lower risk premium used by DukeSolutions.

{72}    The Court also concludes that the weight given to the DukeSolutions offer was appropriate.  It was never a firm price but was an arm's length transaction indicating the value a knowledgeable purchaser placed on the business after due diligence.  All the shareholders rejected the offer as too low.  Giving the offer weight was therefore appropriate, as was the allocation selected by the expert.

{73}    The expert's rejection of the defendants' proposed adjustment to revenues based upon the Arcadia[4] bad debt was also well founded.  To have adjusted a clear revenue stream to reflect one bad debt (albeit a large bad debt) would have unrealistically reflected the earning potential of the company and improperly lowered its value.  Likewise, the expert was correct in not including the receivables from Arcadia as an asset as urged by the plaintiffs since there was no assurance any amount would ever be received.

{74}    The Banister Valuation also appropriately considered the key man status of Aubrey Hilliard.  There is little doubt that this company would not have gotten off the ground and would not be successful in the future without Aubrey Hilliard. It is also clear that Aubrey Hilliard made a deal to protect his income flow while in prison and that he could not have done so without plaintiffs.  Mr.

Hawkins clearly recognized Mr. Hilliard's value. *See* Banister Valuation, at 5, ¶ 4 (entitled "Important Assumption Regarding Aubrey Hilliard"). Mr. Hilliard's key man status was clearly reflected in the valuation in at least two places. First, his status was one of the reasons the expert used a high equity risk premium, resulting in a lower value. Second, in ascertaining cash flow, the expert used a high salary for Mr. Hilliard, thus lowering cash flow and the value of the company. Accordingly, the value determined by the expert takes into account Hilliard's value to the company, but also correctly assumes he is and will be an active participant in the company's affairs. It would clearly be inequitable for Mr. Hilliard to continue with the company but be able to purchase the minority shares based upon his absence. The expert's treatment of this issue was appropriate.

{75}     Finally, the Court turns to a consideration of the testimony of John McCord, an expert concerning the issue of valuation of gas marketing companies, to the effect that there is no present market to sell Southeastern. If Mr. McCord is correct, that would confirm Mr. Hawkins' assessment that there was not enough reliable information to rely on a market approach to valuation. To base a valuation on one snapshot in time would be inappropriate. Mr. Hilliard's foresight that there would be a convergence in electrical and gas utilities has been confirmed. In 1999 DukeSolutions was prepared to purchase the company. The market has changed today and in all probability will change in the future. Mr. McCord's valuation was based not on a study of the company, but on his knowledge of the current market. That this company has long-term value is evidenced by the defendants' own actions. First, when suit was filed, the company and Mr. Hilliard automatically elected to purchase the minority shares. Their view did not change until the Banister Valuation was received. Second, when the DukeSolutions offer was rejected, Mr. Hilliard wrote the corporation's counsel and justified his rejection of the offer on the basis that the long-term future for the company would generate value for him and the other shareholders far in excess of the DukeSolutions offer. Third, the company battled through the payment of the Arcadia debt when it could have declared bankruptcy and reconstituted itself. Had the company not had long-term value there would have been little incentive to do so. Fourth, Mr. Hawkins included a discount for lack of marketability for the whole company in his valuation. Fifth, the company has continued to grow its revenues as Mr. Hilliard predicted. Any company which can produce the kind of income stream this company has produced for its owners has value. That value is particularly evident in the circumstances in this case where Mr. Hilliard has the ability to withdraw most of the income of the company and has no real incentive to sell it. The fact that there is not a ready market today does not mean the company does not have value. It is one factor to be considered in the overall picture. The Banister Valuation used a reasonable and reliable

methodology for valuing this company.

{76}    Mr. Hawkins determined four separate valuations at the request of the Court. Those values are set forth below.

| Southeastern Gas & Power, Inc. Summary of Valuation Findings of Fair Value (rounded) | | | | | |
|---|---|---|---|---|---|
| Valuation Date and Interest Valued | # of Shares Being Valued | Value Per Share Control | Total Value on Control Basis | Value Per Share Minority | Total Value on Minority Basis |
| As of 12/10/99 100% Control 39%Minority Interest | 10,000 3,900 | $241.32 $241.32 | $2,413,200 $941,148 | N/A $84.20 | N/A $328,380 |
| As of 12/31/00[5] 100% Control 39% Minority Interest | 10,000 3,900 | $228.91 $228.91 | $2,289,100 $892,749 | N/A $44.37 | N/A $173,043 |

{77}    The Court concludes that it would be inequitable under the circumstances of this case to impose a minority discount for lack of control or a discount for lack of marketability of the minority shares. Hilliard made the final decision to change the arrangement under which the business was organized. He had the leverage to do so and the minority shareholders did not. While he had a legitimate interest in growing the business and faced some intransigence on the part of the minority shareholders, he chose to use his majority power to defeat legitimate expectations which he had previously agreed to when it was in his interest to do so. He could not turn around and ignore those expectations when he got out of prison. Both parties failed to communicate and negotiate with the other in a business-like fashion. It would also be inequitable to impose a minority discount where the minority shareholders' loss was more than simply being forced to sell their shares.

{78}    Those additional losses are equitable factors which the Court has considered in determining fair value. Plaintiffs have lost employment which can be replaced. They earned more with Southeastern than they would have earned on the open market because of the revenue sharing arrangement. They have been deprived of that additional income since their employment ended and it will be lost to them in the future. The company has and will continue to benefit, since plaintiffs' replacements can be hired at less expense.

{79}    All four partners expected to benefit from the increase in value of the company that would occur as the company grew. Hilliard held that potential benefit out as an inducement to plaintiffs to work harder. Plaintiffs will not have that opportunity now. Should Southeastern elect to repurchase the minority shares, Hilliard will have 100 percent of the remaining shares.

{80}    The Court has considered the value of Mr. Hilliard to the business. Plaintiffs could not have

started this business on their own. It required and still requires Mr. Hilliard's contacts and salesmanship. Had Mr. Hilliard not been under threat of a prison sentence, it is unlikely plaintiffs could have negotiated the original revenue sharing arrangement. All the partners needed each other at that time. The fact remains that Mr. Hilliard never had a no compete agreement, and he remains unrestricted in his future employment if he leaves the company.

{81}    The Court has considered changes in the company since the valuation, particularly the change in financial partners. The Court has also considered the economic slowdown which commenced in the fall of 2000 and the volatility of the market for natural gas.

{82}    The Court has additionally considered the practical implications of its decision. As this Court noted in *Royals*:

> A fair price is not one which automatically results in dissolution. The funds for purchasing the minority shareholders' interests must come from borrowed funds or operation expenses. Each alternative affects the future profitability of the company and its ability to function. If the "market valuation" results in a price that makes purchase impractical or impossible, the Court should take that into consideration. If the Court in effect forces dissolution by the price it sets, and the minority shareholders would receive less in liquidation than they would at a price less than "market valuation," their interests may be better served by the fair value price which is greater than the liquidation price.

1999 NCBC 1, ¶ 59.

{83}    In this case, it will likely be difficult for Southeastern to borrow money. It has no hard assets to offer as security. Mr. Hilliard is not a good credit risk because of his prior bankruptcy and tax fraud conviction. Therefore, it is likely the payment for the minority shares will have to come from operating income. The liquidation value of this company is probably very small.

{84}    Having considered the thorough and well reasoned valuation by the independent court appointed expert, the testimony at trial from all the witnesses, and the factors set forth above, the Court finds as a fact and concludes as a matter of law that the "fair value" of a minority share for purposes of the rights and remedies provided by N.C.G.S. § 55-14-31(d) is $240 per share for a total of $936,000 for the 3,900 minority shares.

{85}    Southeastern shall have 15 business days from the date of the order to make its election, which shall be filed in writing with the Court. Closing of any purchase shall take place within 45 business days of this order.

{86}    Pursuant to the statute and the Court's inherent equitable powers, the Court concludes that the procedure for the purchase of the plaintiffs' shares, if elected by the company, shall be as follows. The purchase price shall be paid 25 percent at closing and the balance in the form of a promissory note due in 36 monthly installments. The note should be secured by all assets of the company, including

without limitation its receivables and claim in the bankruptcy proceeding of Arcadia Energy. The note should bear interest at the legal rate and be accelerated on a change of control, any sale of assets not in the ordinary course of business or the resignation of Aubrey Hilliard. The terms of the note and security agreement shall be subject to approval by the Court.

{87}    Plaintiffs have requested in their proposed Findings of Fact and Conclusions of Law that Hilliard be enjoined from competing with Southeastern in the event that he causes Southeastern to elect not to purchase the plaintiffs' shares. Their obvious concern is that Hilliard has the customer contacts and can reestablish the business as a new concern or take the business to a new employer. They cite the contract provisions he had inserted in the new supplier agreements to support their concerns. The equitable relief which an injunction would provide is precisely the discretion which the Legislature took away from the courts after the *Meiselman* decision. The legislative scheme is clear. The alternatives are dissolution or buyout. The courts are not to furnish other remedies that are not otherwise available. In this case, if Hilliard had signed an enforceable no-compete agreement at any time, that agreement could be enforced. None of the shareholders signed such agreements. If a receiver is appointed, the receiver may review the business and determine if there has been any breach of fiduciary duty which would warrant litigation against a shareholder. This Court has no authority to grant the injunctive relief requested at this time.

{88}    Wherefore, based upon the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, ADJUDGED AND DECREED:**

1.    Subject to the alternative relief provided below, Southeastern Gas & Power, Inc. should be dissolved pursuant to the provisions of N.C.G.S. § 55-14-30(2)(ii).

2.    Pursuant to the provisions of N.C.G.S. § 55-14-31(d), Southeastern Gas & Power, Inc. shall have 15 business days in which to decide whether to purchase the 3,900 shares of stock held by the plaintiffs. The purchase price is set at $240 per share. Closing shall take place within 20 business days of the election. The purchase price shall be paid 25 percent at closing and the balance in the form of a promissory note due in 36 equal monthly installments. The note should be secured by all assets of the company, including without limitation its receivables, the claim in the bankruptcy proceeding of Arcadia Energy, and plaintiffs' stock. The note should bear interest at the legal rate and be accelerated on a change of control, any sale of assets not in the ordinary course of business, or the resignation of Aubrey Hilliard. The terms of the note and security agreement shall be subject to approval by the Court. In the event any distribution is received on account of Arcadia Energy, thirty-nine percent of the distribution shall be paid to plaintiffs within ten days of receipt and credited on the note as a payment of principal. Monthly payments would be adjusted accordingly.

3.     Upon default in payment of the promissory note by defendants, the note will become immediately due and payable.

4.      In the event that Southeastern Gas & Power, Inc. elects to purchase plaintiffs' stock, plaintiffs are ordered to transfer said stock to the company upon the company's compliance with the terms of this order.

5.     In the event that Southeastern Gas & Power, Inc. does not elect to purchase plaintiffs' stock, counsel for plaintiffs shall prepare and submit to the Court an order for dissolution and appointment of Thomas J. Ashcraft as receiver within ten days of notice of the election.

6.      The cost of the Banister Valuation and of the referee appointed by the Court for compensation issues shall be taxed as costs in this action and shall be paid by Southeastern Gas & Power, Inc.

7.    The Court retains jurisdiction of this matter to enforce this order.


This the 14th day of November, 2001.


Ben F. Tennille
Special Superior Court Judge
for Complex Business Cases

---

[1] Given a two-month lag between the start of business and the earliest receipt of cash margins, the first report was circulated in March 1998.

[2] Pls.' Ex. 40, Banister Financial Valuation Report, Ex. 4.

[3] The Banister Valuation was also prepared in consideration of Revenue Rule 59-60, issued by the Internal Revenue Service (listing eight broad factors requiring careful analysis with respect to the valuation of closely held common stocks).

[4] Southeastern encountered problems with a large receivable from Arcadia Energy Corporation. In the second half of 2000, Arcadia filed for bankruptcy protection and consequently stopped making payments on its obligations to Fina.  Southeastern had guaranteed those payments to Fina and absorbed a substantial loss as a result.

[5] The value shown at 12/31/00 does not incorporate any value that may be attributable to a receivable from Arcadia Energy Corporation totaling $1,603,758 that is held by Fina and will be assigned at some point to the Company.  Arcadia is operating under bankruptcy protection and no payments have been received.   The value of this receivable cannot be ascertained.