In Re Wachovia S'holders Litig., 2003 NCBC 10

| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE SUPERIOR COURT DIVISION |
|---|---|

FORSYTH COUNTY

| In Re Wachovia Shareholders Litigation | 01 CVS 4486 |
|---|---|
| | [Consolidated with 01 CVS 4810; 01 CVS 4748; 01 CVS 4868; 01 CVS 5163; 01 CVS 6893; 01 CVS 10641; 01 CVS 10075] |

COUNTY OF GUILFORD

HARBOR FINANCE PARTNERS,
derivatively on behalf of Wachovia
Corporation,

        Plaintiff,

        v.

JAMES S. BALLOUN, PETER C.
BROWNING, W. HAYNE HIPP,
LLOYD U. NOLAND, III, DONA
DAVIS YOUNG, LESLIE M. BAKER,        01 CVS 8036
JR., THOMAS K. HEARN, JR.,
ELIZABETH VALK LONG,
MORRIS W. OFFIT, JOHN C.
WHITAKER, JR., F. DUANE
ACKERMAN, JOHN T. CASTEEN, III,
GEORGE W. HENDERSON, III,
ROBERT A. INGRAM, GEORGE R.
LEWIS and FIRST UNION
CORPORATION,

        Defendants,

and WACHOVIA CORPORATION,

        Nominal Defendant.

## ORDER AND OPINION

{1}     These two related cases, a class action (*In Re Wachovia Shareholders Litigation*) and a derivative suit (*Harbor Finance Partners, derivatively on behalf of Wachovia Corporation v. James S. Balloun et al.*), arise out of litigation commenced when First Union Corporation ("First Union") and Wachovia Corporation ("Wachovia") announced a proposed merger. The consolidated class action cases have been

dismissed on a Consent Motion To Dismiss All Consolidated Actions As Moot. The shareholder plaintiffs in that action have filed a Motion For An Order Granting Their Application For Counsel Fees and Expenses.

{2}    Defendants have moved to dismiss the Harbor Finance action for failure to comply with N.C.G.S. § 55-7-42. Counsel for Harbor Finance requested that the case not be dismissed without giving them the opportunity to apply for attorney fees and expenses. With the Court's permission, they filed a fee petition after the hearing on Wachovia's motion to dismiss.

{3}    The pending motions, together with the motion for attorney fees in the *In Re Quintiles Transnational Shareholder Litigation* decided today, raise fundamental questions of corporate governance and require the Court to consider how best to balance the conflicting needs to protect shareholder interests and maintain rational transaction costs in mergers and acquisition litigation. The Court concludes that the fairest, most efficient and economical procedure is close judicial management of the class action process coupled with a recognition that attorney fees may be paid in connection with those cases. However, the Court recognizes that there is legitimate contention that its decision to award attorney fees where there is no common fund may represent a departure from existing common law rules. Accordingly, the Court urges the North Carolina Supreme Court to grant discretionary review to determine the important questions of law presented by these motions if presented with a petition. The Court also believes that its determination of the standard for determination of attorney fees is a subject ripe for review by the appellate courts. The two determinations are interdependent to the extent that the criteria for awarding attorney fees impacts the transaction costs the trial court considers in determining the best method of protecting shareholder rights in merger and acquisition cases. The Court dismisses the Harbor Finance case both for failure to comply with the statutory procedure and for failure to prosecute what are now moot claims. This Court declines to award any attorney fees or expenses to counsel for Harbor Finance in the derivative action for the separate reasons set forth below.

*Wilson & Iseman, L.L.P., by G. Gray Wilson (Co-Lead Counsel) and Linda L. Helms; Abbey Gardy, LLP, by Arthur N. Abbey, Stephen T. Rodd (Co-Lead Counsel) and Stephanie D. Amin; McDaniel, Anderson & Stephenson, LLP by L. Bruce McDaniel; Cauley Geller Bowman & Coates, LLP, by Howard K. Coates, Jr. and Jonathan M. Stein; Schriffrin & Barroway, LLP by Marc A. Topaz and Gregory Castaldo; Chitwood & Harley by Martin D. Chitwood, Jeffrey H. Kronis and M. Krissi Temple; Kantrowitz, Goldhamer & Graifman, P.C.; Malcolm & Schroeder, L.L.P. by John G. Malcolm and Robert F. Schroeder; Finkelstein, Thompson & Loughran by Burton Finkelstein and Jessica F. Whitehurst; The Finnell Firm by Robert Finnell; Clark, Bloss & McIver, P.L.L.C., by John F. Bloss; Kirby McInerney & Squire, L.L.P., by Ira M. Press; Bernstein, Liebhard & Lifshitz, LLP: for Wachovia shareholder plaintiffs.*

*Donaldson & Black, P.A. by Arthur J. Donaldson and John T. O'Neal; The Brualdi Law Firm by Richard B. Brualdi and Kevin O'Brien: for Plaintiff Harbor Finance Partners.*

*Robinson, Bradshaw & Hinson, P.A. by Robert W. Fuller and Katherine G. Maynard; Deputy General Counsel Francis Charles Clark: for Defendant First Union Corporation, n/k/a Wachovia Corporation.*

*Bell, Davis & Pitt, P.A. by William K. Davis; Brooks, Pierce, McLendon, Humphrey & Leonard,*

*L.L.P. by James T. Williams, Jr.: for Defendants Wachovia Corporation, Leslie M. Baker, Jr., James S. Balloun, Peter C. Browning, W. Hayne Hipp, Lloyd U. Noland, Dona Davis Young, Thomas K. Hearn, Jr., Elizabeth Valk Long, John C. Whitaker, Jr., F. Duane Ackerman, John T. Casteen III, George W. Henderson, III, Robert A. Ingram and George R. Lewis.*

*Kilpatrick Stockton, L.L.P. by J. Robert Elster and Richard S. Gottlieb for Defendant Morris W. Offit.*

# I.

{4}    These motions raise the question of how the North Carolina courts will control the agency costs, including litigation expenses, associated with the merger or sale of the modern American corporation which has a large and dispersed shareholder base. The control of those agency costs has been the focus of much study by corporate law scholars for many years, most recently in a comprehensive work paper prepared by Robert B. Thompson and Randall S. Thomas for the Columbia Center for Law and Economics.[1]    They postulate the question this way:

> The key policy question is how to properly balance the positive management agency cost reducing effects of shareholder litigation against the often-maligned litigation agency costs. Some tradeoffs between the two are inevitable, but where the proper balance should be struck is important if litigation is to be a significant force in bringing about good corporate governance.[2]

{5}    These cases present a unique opportunity for our courts to address that balance. They arise at a time when the importance of sound corporate governance to the health of our capital markets is a matter of national concern.[3]    The juxtaposition of the class action, the derivative action and a suit by a competing bidder in the setting of one merger transaction, combined with the attorney fees sought by counsel for both class and derivative plaintiffs, sharply focuses the Court's attention on the competing interests and costs. Nowhere is the cost balancing more difficult than in a merger transaction challenged by a third party bidder for the company to be acquired. In those situations, as here, the third party bidder (here, SunTrust) usually mans the laboring oar in the litigation.  In those cases, as here, the goal is not to create a common fund or pool for recovery but to obtain the best offer in an open market for shareholders who are not coerced to sell. While no fund is created, maximization of shareholder value is the goal. The typical case, as here, involves a challenge to deal protection devices that the plaintiffs, including the third party bidder, claim prevent a fair vote on the merger proposal or unfairly restrict competitive bidding. The deal protection devices become more important in a "merger of equals" because the premium to be paid for the acquired company is low. Such deals can frequently attract third-party bidders. They also attract shareholder litigation.  Where a subsequent bidder prevails, it is often difficult, if not impossible, to determine how much of the increased offering price was attributable to the litigation as opposed to increased value generated by the market. [4]

{6}    If we start from the premise that shareholders have three basic rights—to vote, sell and sue for

breach of fiduciary duty [5]— the right to sue becomes more important if the shareholders' abilities to vote or sell are at risk. Accordingly, the court should be careful in adopting rules or procedures that unduly restrict the tools available to shareholders to protect their fundamental rights to sell and vote their shares. Deal protection devices inherently involve one of those rights. Concomitantly, the trial courts must control the litigation costs associated with providing that protection and assure that the interests of the lawyers and their clients (shareholders) are properly aligned.

{7}     These issues fit within the following factual and procedural context.

{8}     On April 15, 2001, First Union and Wachovia announced their planned merger. Almost immediately, plaintiffs' counsel began filing lawsuits, starting with the Bennett and Leser suits on May 1. Five more suits followed, each featuring allegations substantially identical to those in the first two:

| Plaintiff | Plaintiff's Counsel | Date Filed |
|---|---|---|
| Bennett 01 CVS 4486 | Law Firm of Harvey Greenfield Wilson & Iseman Kantrowitz, Goldhamer & Graifman | May 1, 2001 |
| Leser 01 CVS 5163 | Clark, Bloss & McIver Kirby, McInerney & Squire | May 1, 2001 |
| Heaney 01 CVS 4748 | McDaniel, Anderson & Stephenson Schriffrin & Barroway | May 14, 2001 |
| Wachsman 01 CVS 4810 | Brown & Assoc. Bernstein, Liebhard & Lifshitz | May 17, 2001 |
| Drucker 01 CVS 10641 | Ferguson, Stein, Wallas, Adkins, Gresham & Sumpter Morris & Morris | May 29, 2001 |
| Rosenburg 01 CVS 4868 | McDaniel, Anderson & Stephenson Cauley, Geller, Bowman & Coates | June 1, 2001 |
| Hrobar 01 CVS 0006893 | Abbey Gardy Chitwood & Harley McDaniel, Anderson & Stephenson | June 6, 2001 |

Seven separate complaints (the "Shareholder Suits")were filed by 17 different law firms for eight named plaintiffs; twelve firms, representing seven of the named plaintiffs, joined in the fee petition at issue here.

{9}     On July 6, 2001, this Court entered an order consolidating the above individual actions into one action, In re Wachovia Shareholder Litigation, 01 CVS 4486.

{10}     First Union filed suit against SunTrust in Mecklenburg County Superior Court on May 22, 2001 (01 CVS 10075). The action was filed shortly after Wachovia's board started its meeting to consider SunTrust's proposal to merge with Wachovia. The next morning, First Union filed an amended complaint,

and Wachovia joined the action as a co-plaintiff.  Less than an hour later, SunTrust sued both Wachovia and First Union in the Superior Court of Fulton County, Georgia.  SunTrust immediately moved to consolidate its Georgia action with a previously filed shareholder suit in Georgia and asked for a hearing in Georgia (01 CV 38062).  Anticipating a classic "forum fight," on May 24, 2001, First Union and Wachovia obtained a temporary restraining order ("TRO") prohibiting SunTrust from moving forward with its second-filed action in Georgia.  SunTrust subsequently removed the Mecklenburg County action to the United States District Court.

{11}    Judge Lacy Thornburg granted First Union and Wachovia's emergency motion to remand on May 30; the Superior Court set a hearing on the motion for preliminary injunction for June 1, 2001.  At this point, SunTrust conceded in the forum fight and agreed during the night of May 31/June 1 to have this Court hear the First Union/Wachovia/SunTrust case (hereinafter the "SunTrust Case").  A few shareholder suits filed in Georgia were voluntarily dismissed by the plaintiffs.  None of the counsel seeking fees here had a role in the forum dispute.

{12}    On June 14, 2001, Harbor Finance[6] joined the fray by filing a derivative action pursuant to North Carolina Gen. Stat. § 55-7-40 *et seq.*  The Harbor Finance action (01 CVS 8036) was assigned to the Business Court on July 9, 2001.  For efficiency's sake, the Court ordered Harbor Finance's attorney to cooperate with SunTrust and the Shareholder plaintiffs in conducting discovery.

{13}    After a conference with counsel, this Court set a schedule for the SunTrust Case.  The Shareholder Suits and Harbor Finance essentially "tagged along" as a consolidated action.  The Court appointed Wilson & Iseman and Abbey Gardy as co-lead counsel for the Shareholder Suits and ordered that a consolidated amended complaint be filed by these counsel.  Counsel filed the consolidated amended complaint on July 5, 2001 two business days before the conclusion of all discovery.

{14}    During June and the first three weeks of July, the SunTrust Case proceeded at an extremely expedited pace on the following schedule:

(a)  On June 18, this Court heard the motions to dismiss SunTrust's counterclaims filed by Wachovia and First Union and ordered that the Main Case proceed (other than dismissing a Georgia antitrust claim).  Wachovia and First Union filed 43 pages of briefs supporting these motions.  SunTrust filed 26 pages of briefs opposing the motions.  Counsel in the Shareholder Suits filed nothing, not yet having filed their consolidated amended complaint.

(b)  After expedited document production from Friday, June 29, through Monday, July 9, counsel in the SunTrust Case took 16 depositions.  SunTrust, Wachovia, and First Union decided who would be deposed.  Counsel in the Shareholder Suits attended 15 of these depositions.  Except for the deposition of Eric Heaton in New York, where Shareholders' counsel asked questions for approximately one hour, the questions of Shareholders' counsel appear on only 23 transcript pages, in total, for all 15 depositions they attended.[7]  The derivative plaintiff, Harbor Finance, attended three depositions.  It offered the following information regarding its participation: "Due to timing limits on the depositions imposed by the Court, Harbor's participation in depositions generally consisted of attending depositions and suggesting questions to counsel for SunTrust, which that

counsel almost always asked."

(c) On Friday, July 13, and Monday, July 16, counsel for SunTrust, Wachovia, and First Union filed extensive briefs (totaling 233 pages) in support of and opposing motions for preliminary injunction and summary judgment. Counsel for the Shareholders filed a single four-page brief that joined in the initial SunTrust brief.

{15} SunTrust did not appeal this Court's order, and counsel for the Shareholders did not pursue an appeal independently. At the time it considered SunTrust's motion for preliminary injunction (and the tagalong motions of Harbor Finance and the Shareholder Plaintiffs), the Court reserved the issue of whether Harbor Finance could properly maintain a derivative action on behalf of Wachovia. *See* Plaintiff's Preliminary Injunction Br. at note 3. In October 2001 defendants answered the Amended Complaint and moved to dismiss plaintiff's claims on multiple grounds.

{16} On July 20, this Court issued its opinion, holding that the challenged cross-options were valid but determining that the termination provisions of the merger agreement tied the hands of Wachovia's board in an impermissible manner. The Court denied all of SunTrust's motions (and the tagalong motions of the Shareholders' counsel), holding that, with the opinion in hand, Wachovia shareholders could vote on the merger in an informed manner, thus obviating any need for affirmative relief. Wachovia and First Union promptly and voluntarily amended the termination provisions in the merger agreement in a manner that conformed to the Court's opinion. First Union's shareholders approved the merger on July 31, and Wachovia's shareholders approved the merger on August 3. The merger was consummated on September 1.

{17} Except for the voluntary dismissal of the SunTrust Case, there was no litigation activity at all for over a year after the Court issued its opinion. On September 13, 2002, the Court signed a Consent Order tendered by the parties dismissing all the Shareholders' cases with prejudice and granting the Shareholders' counsel 30 days after entry thereof in which to file a fee petition (with Wachovia reserving its rights, in full, to argue that no fees should be awarded).

{18} During the April 9, 2003 oral arguments on the Shareholder Plaintiffs' motion for fees and costs and the motion to dismiss Harbor Finance's derivative claims, this Court requested that Harbor Finance submit a detailed affidavit regarding its costs and fees. The Court also asked the Shareholder Plaintiffs to submit more detailed time records in support of their motion for fees and costs. In the interests of efficiency and in order to present a fuller record for appellate review, the Court is entering one order that will contrast the class action and derivative action and the costs and fees associated with those actions.

II.

{19} The Court turns first to the questions raised in the derivative action.

{20} The North Carolina statutory procedure is set forth in section 55-7-42 of the North Carolina General Statutes as follows:

> No shareholder may commence a derivative proceeding until:
> 1) A written demand has been made upon the corporation to take suitable action; and
> 2) 90 days have expired from the date the demand was made unless, prior to the expiration of the 90 days, the shareholder was notified that the corporation rejected the demand, or unless irreparable injury to the corporation would result by waiting for the expiration of the 90-day period.

N.C.G.S. § 55-7-42 (1995).

A.

{21}     This case and other cases challenging deal protection devices demonstrate the difficulties of the derivative action as a means to protect shareholder rights in the fast- paced deal environment under North Carolina law. [8] Companies desiring to consummate a merger will generally move as swiftly as possible to complete the transaction. There are sound business reasons for the rapidity with which companies act. The financial markets, commercial markets and employees all look for certainty. Once a deal is announced, many things can intervene between announcement and closing which could derail the transaction. The clearest threat is the intervention of another bidder. However, there are limitless other possibilities: natural disaster, financial market changes, strikes and government intervention, just to name a few. Each side naturally wants the transaction to move promptly to closing.

{22}     Our derivative statute does not adequately or specifically address the time pressure created in the merger of publicly traded companies. It is designed to substitute for litigation by and on behalf of the corporation when management or directors are conflicted or refuse to act in the best interest of the corporation. The derivative claim belongs to the corporation, and any recovery belongs to the corporation. The shareholders may not recover individually in a derivative action.

{23}     The ninety-day waiting period embodied in the statute does not provide a realistic time frame within which to deal with challenges to proposed mergers. The speed with which transactions are completed requires that the ninety-day period be shortened. However, the mechanism for shortening the ninety-day waiting period is unclear. It is the failure of Plaintiff Harbor Finance to take action to shorten that response period which defendants rely upon for dismissal of this action.[9]   The ninety-day waiting period is generally designed to give the board of directors sufficient time to consider and act upon any request for action. It is normally a rational period, since the board must make some factual inquiry in connection with the action it is being asked to take, and boards do not meet frequently.  The board may take corrective action on its own, thus avoiding the cost of litigation. It may select a committee of independent directors to decide if it is in the best interest of the corporation to pursue the action demanded, or it may ask the court to appoint an advisory committee to act on behalf of conflicted directors.[10]  The purpose is twofold: first, to give the corporation the option to pursue its own claims,

and second, to hold down litigation costs.

{24}     In the context of a proposed merger containing deal protection devices, the derivative statute does not work particularly well. In the first instance, the ninety-day waiting period is too long.  Allowing the board a full ninety days to consider the demand in connection with a pending merger is unrealistic and does not provide the certainty required in the acquisition environment. On the other hand, simply waiving the ninety-day period without providing an opportunity for the company to act defeats the purpose of the statute. The demand requirement has benefits in the merger context.[11]

{25}     For those reasons, this Court has interpreted the statute to require that an adequate demand be made and that the plaintiff move to shorten the response time based upon a showing of irreparable injury as required by the statute.[12]

{26}     In the acquisition environment, the board, in all probability, has considered the deal protection devices incorporated in the merger agreement at some length and, after consultation with counsel and investment bankers, has determined that to include those protections in the merger agreement would be in the best interest of the corporation. It would not be logical to reassign that responsibility to a court-appointed advisory committee.  Deal protection devices are carefully negotiated components of an overall business agreement.[13]  The advisory committee could not unilaterally take action without renegotiating the deal.  Deals would never get done.

{27}     While the derivative claim technically fits in the merger situation, it misses the mark to a certain extent by couching the claim as one that the corporation has against its directors. Shareholder rights and interests are central considerations at stake in this type of litigation.  It is more logical to litigate the claims in the context of shareholder rights than in the context of a corporate claim for breach of fiduciary duty. In most cases, the relief sought is injunctive relief designed to alter or eliminate a deal protection device that allegedly unfairly impacts the shareholder voting process.

{28}     The derivative action also does not afford the trial court the degree of supervision it might exercise in the class action setting. In the derivative action, the client may have selected the lawyer and may even be a professional plaintiff with an ongoing relationship with the law firm—factors more limiting than the options the court may have in a class action with several potential class representatives and counsel from which to choose. There is less flexibility in a derivative action than in a class action, where the court can define the class and the claims to be pursued.[14]

{29}     In most jurisdictions complaints based upon breach of fiduciary duty in the acquisition context are brought as class actions.[15] The derivative action is generally reserved for conflict of interest claims in the non-acquisition context.  However, some challenges to deal protection devices do arise in the derivative context.

{30}     Turning to the case at hand, there are several factors that demonstrate the difficulties and inefficiencies associated with the use of derivative actions in acquisition situations. In this case, the

derivative action was filed after the class action litigation had begun and after the SunTrust/Wachovia litigation had commenced. Plaintiff's counsel wrote a demand letter and sent it via Federal Express. Wachovia declined receipt of the FedEx package. Plaintiff's counsel subsequently sent the letter by first class mail addressed to the board of directors. Plaintiff then commenced suit. At no time did plaintiff make an attempt to shorten the time for response to the demand letter.

{31}     As a result of the late filing of the derivative action and its assignment to the Business Court there was no time to address the deficiencies of the derivative process.  The Court permitted Harbor Finance to participate in the SunTrust case and the shareholder suits with the clear understanding that is was without prejudice to defendants' right to raise any defenses to the derivative action.

{32}     The decision to use the derivative action as opposed to a class action could not have been an inadvertent selection by this plaintiff. Harbor Finance clearly fits the description of a "professional plaintiff."  In their study of Delaware cases, Thompson and Thomas found two partnerships at the top of the class action list of most frequent plaintiffs: Harbor Finance and Crandon Capital.[16] The study also showed:

> The plaintiffs law firms that bring the largest number of class actions, shown in Table 12, are much less frequently involved in derivative suits. In the 83 lead derivative cases, the repeat law firms are involved in only 27 (32%) as compare to 76% of all class actions. As for the plaintiffs themselves, the only plaintiffs with more than two filings are two partnerships that were at the top of the list in the class action area: Harbor Finance with five suits and Crandon Capital with four. *We note that the derivative cases these entities filed were never the only suit filed and were often associated with class actions or federal litigation against the same company.*[17] (Emphasis added)

{33}     The Thompson study speculates that there is a relationship between Crandon Capital Partners and Harbor Finance.[18]  This Court's research indicates that Crandon Capital Partners is the general partner of Harbor Finance Partners, Ltd.[19]  The Court's research further disclosed that Harbor Finance has been involved in at least 35 suits based upon a claim of breach of fiduciary duty, and the majority of those cases involved mergers or acquisitions.[20]  That number does not include three cases brought under the name of Breakwater Partners since August of 2002, when Harbor Finance changed its name.[21]  One of those cases was filed in North Carolina and is assigned to this Court.  *See In re Quintiles Transnational Litigation.*[22]  In that litigation, counsel for Breakwater Partners (The Brualdi Law Firm) was the first to file a class action suit alleging breach of fiduciary duty in a tender offer situation.  Other lawyers were designated lead counsel in that litigation.

{34}     A review of the pleadings and demand letter reveals that there were no claims asserted by Harbor Finance not already at issue in the class action litigation and the third-party litigation filed by SunTrust, a conclusion readily apparent to a plaintiff with Harbor Finance's experience in merger and acquisition litigation.

{35}     Given the sophistication of plaintiff and its counsel and the timing of their actions, as well as the duplicative nature of the claims asserted, the Court is led to the disturbing conclusion that the demand and subsequent derivative suit were filed solely to get a piece of the litigation fee pie.  Counsel's fee request, discussed in more detail below, supports that conclusion. An efficient system should not reward or encourage that conduct.

{36}     The lack of clarity in the statute with respect to how the time for board response gets shortened highlights the court's role in managing merger and acquisition litigation efficiently.  The court must have the opportunity to review and rule on assertions of irreparable injury.  In this instance, had a motion and supporting papers been filed, the Court could have addressed two aspects of the irreparable injury inquiry.  First, the Court would have been required to determine if the issues raised in the demand were of a sufficiently urgent nature that they required determination before a shareholder vote.  In this case it was clear that the deal protection devices being challenged had the potential to impact the vote, and a preliminary injunction hearing was necessary to determine their viability.  If the derivative action had not been an add-on to the preexisting litigation, the Court might well have determined it necessary to shorten the response time or eliminate it altogether.  However, the Court could also have considered the existence of the prior pending litigation in which the shareholders' interests were adequately represented.  Accordingly, the Court might have determined that there was no irreparable injury to the corporation and that the corporation should not have to incur the additional costs and expenses of dealing with separate claims in a derivative action that were identical to claims already at issue.  Each case will be fact specific.  In this instance the Court never had the opportunity to make the necessary determinations because the statutory procedure of waiting 90 days or having the period shortened was not followed.

{37}     Failure to comply with the demand requirements of N.C.G.S. § 55-7-42 constitutes an "insurmountable bar" to recovery.  *Allen v. Ferrera*, 141 N.C. App 284, 540 S.E.2d 761, 764 (2000); *see also Winters v. First Union Corp.,* 2001 NCBC 08 (No. 01 CVS 5362, Forsyth County Super. Ct. July 13, 2001) (Tennille, J.); *Garlock v. Hilliard*, 2001 NCBC 10 (No. 01 CVS 01018, Mecklenburg County Super. Ct. November 14, 2001) (Tennille, J.); *Greene v. Shoemaker*, 1998 NCBC 4 (No. 97 CVS 2118, Wilkes County Super. Ct. October 24, 1998) (Tennille, J.).   The *Harbor Finance* case is subject to dismissal for failure to comply with the statutory process.


{38}     Defendants have also moved to dismiss under the statute for failure to make demand "with sufficient clarity and particularity to permit the corporation . . . to assess its rights and obligations and what action is in the best interest of the company."

{39}     The Court first addresses the method of conveying the demand. Simply put, it must be done in a fashion that insures that the Company receives the demand so that it can act on it.  It must be addressed to a responsible official, for example the corporate secretary or general counsel.  It must be delivered in a manner that shows that it has been received and when; personal delivery or certified mail are two

examples. Where the company is on notice of the contents of the letter or of a forthcoming demand, it avoids dealing with the issue at its peril. It may not simply refuse to accept what it knows is a demand letter and then deny that it has rejected the demand.

{40}     This Court has held that the statutory requirement of sufficient specificity must be met. *See Garlock*, 2001 NCBC 10 at 14-19; *Greene* 1998 NCBC at 15-25. In this instance, the demand letter dated June 1, 2001 brought to the attention of the board of directors four aspects of the transaction which Plaintiff Harbor Finance believed were potential violations of fiduciary duty. First, plaintiff asserted that the board was obligated to shop or auction the company. Second, plaintiff found objectionable the provisions of the agreement that reserved nine board seats on the new board for Wachovia directors and that insured that Leslie M. Baker, Jr. would be chairman of the new board. Third, plaintiff objected to the including the termination fee as a deal protection device. Fourth, plaintiff objected to including the non-termination provision in the merger agreement as a deal protection device. The first two claims were never seriously pursued, with good reason.

{41}     The two deal protection devices were the focus of the litigation. In the context of merger and acquisition litigation, the letter was sufficient notice of the provisions of the agreement which plaintiff claimed to be unreasonable. The Court notes that Wachovia's investment bankers had already informed the board that the termination fee was on the outer edges of an acceptable range. In this sophisticated world, all the parties understood the implications and importance of the deal protection devices and the fact that they would be subject to challenge. To impose any greater degree of specificity than that contained in the demand letter would be unreasonable in this context.

{42}     The actual action to be taken by the corporation is unclear and again demonstrates the limitation of the derivative action in this context. It is difficult to impose upon a plaintiff the obligation to specify how the merger should be renegotiated. It is sufficient to point out the deal protection devices are alleged to be coercive, preclusive or in violation of a fiduciary duty and to request that something be done about them. In the unlikely event the board agrees, it should have the flexibility to address the problem. In the shareholder focused class action, the deal protection devices can be more directly addressed as limitations on the right to vote or sell, and thus the relief requested can be tailored to protect the shareholders' rights and secure a market vote free of coercion or preclusion.

{43}     In summary, the demand letter was sufficiently specific with respect to the challenged deal protection devices, and the plaintiff delivered it in an acceptable manner. The instant case demonstrates the difficulty of using the derivative action in the context of certain kinds of merger and acquisition litigation.

{44}     Finally, the Court notes that the Harbor Finance claims are subject to dismissal as moot. After this Court's decision on the preliminary injunction motions was entered on July 20, 2001, no party appealed that decision. Subsequently, the shareholder vote proceeded as scheduled, and the shareholders of both Wachovia and First Union approved the merger. The merger is complete. All Wachovia shares have been

transferred. No claim for monetary damages has been pursued. No discovery has taken place and no motions have been filed. The only requests for action this Court has received (other than to dismiss a Georgia antitrust claim) are the current motion to dismiss by defendants and the request for attorney fees by counsel for Harbor Finance. Plaintiff has not moved to amend the complaint or take any further action. Plaintiff rode the coattails of SunTrust and abandoned the case when those coattails were no longer a means of transportation. The Court never found Harbor Finance to be a suitable representative for the corporation's interest.

{45}    At the hearing on the motions to dismiss the following exchange took place between the Court and Mr. Brualdi:

> **The Court:** I think the obvious reason that they didn't move to dismiss it gives them the best argument that no attorneys' fees ought to be paid.
> **Mr. Brualdi:** Well, that may well be the case, your honor.   In fact, I suspect that your honor is right
> Your honor had asked why—where we thought the case would go from here, and I think that sort of explains why nothing has really happened for a year and that there are arguments that the case is moot under Delaware law.  As your honor pointed out, there's not much left that your honor can do.

Transcript of April 9, 2003 hearing, p. 34.

{46}    Plaintiff's claims are moot.

{47}    Accordingly, the claims of Harbor Finance are dismissed.

B.

{48}     The Court next turns to the fee request filed by plaintiff's counsel. The North Carolina statute governing derivative actions clearly provides that plaintiffs may be awarded attorney fees in derivative actions where they perform some service of value to the corporation or the shareholders. The award of such fees is in the discretion of the Court.[23]  In this instance, the Court finds that neither Plaintiff Harbor Finance nor its counsel provided services of value to the corporation.  Piling on after litigation is already in progress which adequately protects the interests of shareholders should not be encouraged and does not promote the right balance between the incentives and agency costs the courts must consider.

{49}     As the Court has previously noted, at the time the derivative claim was made, SunTrust had already challenged the deal protection devices in the litigation between it and Wachovia. Numerous class actions had been filed challenging the same deal protection devices, and the Court had already appointed capable and experienced lead counsel in those consolidated cases.  The Court permitted Harbor Finance to file a short brief and appear at oral argument in connection with the hearing on the motion for preliminary injunction based solely on the late entry of Harbor Finance into the litigation.  Harbor Finance had not even been determined to be a proper representative for the corporation.

{50}     Neither the brief nor oral argument advanced any position different from or in addition to the

arguments made by SunTrust and lead counsel for the class action plaintiffs. Nor does there appear from the record to be any significant contribution of counsel during the discovery process. The issues were hotly contested between SunTrust and Wachovia, and the validity of the deal protection devices was squarely before the Court. If Harbor Finance had not filed its action, the outcome of this case would have been exactly the same. There is an argument discussed below that shareholders cannot always rely on a third party bidder to protect their interests. In this instance, there was already a backup plaintiff, ably represented in the litigation. The existence of an additional shareholder representative in a different cloak added nothing of value to the protection of the shareholders or the corporation. Plaintiff's counsel brought no skills or abilities to the litigation that were not already provided by experienced counsel for SunTrust and the other shareholders. Harbor Finance's suit did not create synergies or efficiencies. Rather than providing economies, the addition of the derivative action only increased the cost of the litigation. No shareholder value was created to justify the additional cost of the derivative action. Harbor Finance has not shown any tangible or intangible benefit to the shareholders that would not have occurred but for the actions of Harbor Finance or its counsel or as a direct benefit of the actions of Harbor Finance. The fact that counsel for Harbor Finance has taken no action to prosecute this case since SunTrust withdrew is a fairly strong indication that the derivative action was filed solely to ride the coattails of SunTrust's counsel.

{51}    For the foregoing reasons, the Court, in its discretion, denies counsel's request for attorney fees in its entirety.

C.

{52}    Were the Court called upon to award attorney fees in its discretion, those fees would have been in the amount of $25,000 to Brualdi and $5,000 to Donaldson and Black. Those fees would have been determined by the same criteria discussed below. Harbor Finance's quantum meruit claim as the third representative of the shareholders is extremely weak. The shareholders interests were already ably represented by counsel for SunTrust and class counsel appointed by the court. The hourly rate claimed by New York counsel is astonishingly out of line with market rates and includes a risk premium far in excess of any this Court has seen approved. Given the insignificant contribution of counsel upon their late arrival, the size of their fee request is a further indication that New York counsel's interest and those of the shareholders they did not represent were not necessarily aligned.

**III.**

{53}    The Court next turns to the fee issues in the class action litigation. In those cases, because the parties agreed to a consent dismissal of the cases as moot the Court is required to determine only the fee request which is strenuously opposed by defendants.

{54} In this class action no common fund was created. There is no pool of money from which to pay attorney fees and no money to be distributed to shareholders. In this instance there was not even an increase in the stock price attributable to any action by plaintiffs' counsel, nor did any subsequent bidder appear after the Wachovia sleeping pill was invalidated.

{55} Under those circumstances, the fee request raises four issues for consideration by the Court.[24]

{56} First, will North Carolina recognize a "corporate benefit" theory analogous to the common fund theory and award attorney fees where a common benefit is provided in merger and acquisition litigation?

{57} Second, was there a common benefit provided by the litigation in this case?

{58} Third, what standard should the Court apply in determining any fee award?

{59} Fourth, applying that standard, what would an appropriate fee award be in this case?

A.

{60} The appellate courts of North Carolina have never been called upon to rule on the question of whether the creation of a non-monetary benefit for shareholders in a class action will support the award of attorneys fees to prevailing class counsel. In this case the invalidation of a deal protection device in a proposed merger constitutes the non-monetary benefit which is cited to support the fee request. Defendants urge the Court to adopt a view that the Supreme Court will only approve an award of attorney fees where a fund is actually created and will reject an award based upon a common benefit. This Court does not believe the North Carolina Supreme Court will adopt such a bright line test.

{61} Application of such a bright line test ignores the economic realities of merger and acquisition litigation. Such a test would encourage forum shopping for other jurisdictions and deprive North Carolina shareholders of an important means of protecting their interests. It would not promote sound corporate governance. The protection of shareholders and the promotion of sound governance have been hallmarks of North Carolina corporate law.

{62} The Court finds little guidance from the North Carolina decisions relied upon by defendants. The one case which might arguably deal with the issues, *Madden v. Chase*, 84 N.C. App. 289, 292, 352 S.E.2d 456, 458, *rev. denied*, 320 N.C. 169, 358 S.E.2d 53 (1987) is clearly distinguishable. *Madden* involved a going private transaction which was abandoned after suit was filed. It was never certified as a class action and did not deal with the invalidation of deal protection devices in merger agreements between publicly held companies. It is apparent from the short opinion and the cases cited as precedent by the court that the plaintiff's claims were treated as individual claims related to the plaintiff's stock. The *Madden* court said: "Plaintiff brought this action to maintain the value of his investment, not the primary purpose of protecting or preserving public funds or property." 84 N.C. App. at 291, 352 S.E.2d at 458.

{63} This Court is convinced that upon full consideration of all of the policy issues, the North Carolina courts would recognize the corporate benefit theory and permit an award of attorney fees and expenses at the court's discretion to a prevailing class representative where the litigation has resulted in a clear benefit to all the shareholders, even in the absence of a monetary fund. There are a number of significant policy reasons to support application of the corporate benefit theory. Foremost is the fact that the Legislature has recognized that creation of a non-monetary benefit to the corporation can support an award of attorney

fees. *See* N.C.G.S. § 57-7-46.  That statute is a clear indication of the public policy of this state to promote shareholder protection and good governance by the recognition of the right to attorney fees in cases in which a person suing on behalf of the corporation creates a benefit for the corporation. It would be ironic if counsel for Harbor Finance could have recovered a fee in this case if their contribution had warranted it, while class counsel appointed by the Court to represent the shareholder interests could not recover a fee. A practical analysis exemplified by this litigation demonstrates the detriment of such a rule. The denial of attorney fees in class action corporate benefit cases would of necessity drive plaintiffs' counsel to use of the derivative procedure where an award of fees was possible. That practice would not be administratively beneficial in the merger and acquisition context.  As seen above, the demand/rejection process is cumbersome and unworkable in the context of the negotiated merger of two publicly traded companies where the board of directors has already approved an agreement containing deal protection devices.  The use of the derivative action in merger and acquisition cases, particularly hostile or second bidder situations, makes little sense and can only increase the litigation agency costs.

{64}     In the merger and acquisition situation, the board has already decided to take certain action with respect to a proposed transaction or competing transaction.  The interests at issue are shareholder interests, not interests of the corporate entity.  To channel challenges to board action in such cases to the derivative suit would require needless procedural steps and costs.  It would not provide the best vehicle for protecting shareholder interests since the derivative action is designed to assert claims belonging to the corporation and to seek recoveries for the corporation, not the shareholders.

{65}     In addition, most merger and acquisition cases are time sensitive, and proper application of the normal derivative suit procedures would cause delay and an unnecessary additional burden on both shareholders and the board. That is particularly true in North Carolina, where demand futility has been eliminated. The class action mechanism offers the more effective process because it permits the court greater control over the selection and management of class counsel and class representatives.  The derivative action provides fewer controls for the court since either the client has selected counsel or counsel has selected the client in the derivative context.  The class action mechanism, the better option, should not be eliminated on the basis of a distinction in the availability of a fee award.

{66}     The central role class and derivative actions play in corporate governance and the benefit of providing incentives for that litigation were well articulated by Chancellor Chandler in *Seinfeld v. Coker*:

> Next, I turn to the attorneys' fee request. Some of the objectors complain that the settlement rewards the attorneys more than it benefits BankAmerica and its shareholders.  This Court consistently has held that, in class and derivative actions, plaintiffs' counsel are entitled to an award of attorneys' fees and expenses where their efforts achieve a benefit for the corporation or its shareholders.  This is an accepted principle of Delaware law, but its simplicity masks a vexing issue in our jurisprudence.
>
> Delaware courts routinely grant fee awards in order to produce two primary incentives-the incentive for shareholders to bring meritorious lawsuits that challenge alleged wrongdoing

and the incentive for plaintiffs to litigate such lawsuits efficiently. It is important for shareholders to bring derivative suits because these suits, filed after the alleged wrongdoing, operate as an *ex post* check on corporate behavior. If no incentive existed for shareholders to band together to bring these suits, they would very often not be brought. The reason is simple: for the *group* of shareholders, the benefits exceed the costs; for *individual* shareholders, the costs exceed the benefits in the vast majority of cases. When shareholder plaintiffs bring meritorious lawsuits, they deter improper behavior by similarly situated directors and managers, who want to avoid the expense of being sued and the sometimes larger reputational expense of losing in court.

It is equally important, however, for plaintiffs to prosecute these lawsuits efficiently. One of the historic reasons Delaware judges have been so willing to award substantial attorneys' fees, even after a relatively quick settlement of the case, is that our fee awards are not structured to reward lawyers for needlessly prolonging litigation. Put simply, "the Court does not want to be in a position of encouraging the churning of wheels and devoting unnecessary hours to litigation in order to be able to present larger numbers to the Court."

Awarding an appropriate fee should produce both of these incentives.

No. 16964, 2000 Del. Ch. Lexis 172 at * 7, Dec. 4, 2000 (footnote omitted).

{67}     In a footnote, Chancellor Chandler further observed:

Stated differently, "by threatening potential defendants with no less and no more than full liability for the harms they may cause to society, private lawsuits encourage them to take optimal precautions; that is, the threat of liability creates an incentive to raise the level of care or reduce the level of potentially harmful activity to the point at which the marginal increase in the cost of prevention equals the marginal increase in the harm prevented." Note, *The Paths of Civil Litigation*, 113 HARV. L. REV. 1827, 1831 n. 19 (2000).

*Id*. at *7 n.9.

{68}     In particular, challenges to deal protection devices may have three salutary effects. First, they may remove protective measures which coerce a shareholder vote in a particular way. Second, narrowing the scope of the devices may increase the likelihood of subsequent or competing bids enhancing shareholder value. Third, such challenges may prevent directors from abdicating their fiduciary responsibilities.

{69}     Other practical reasons exist to recognize the corporate benefit theory. It is recognized in the market place.  As demonstrated by this Court's approval of the settlements in the *In re Quintiles Shareholder Litigation*  and the *Delhaize* class action, most of these types of cases are settled and an agreement is reached with plaintiffs counsel for payment of a fee subject to approval by the Court.  The Court has addressed that process separately in the opinion in *In re Quintiles Shareholder Litigation*  issued today. To permit payment of fees by contract, subject to court approval, and to deny application for the same fees where no agreement on fees is reached ignores economic reality and may adversely affect the independence of class counsel who find their fee inextricably entwined in the settlement negotiations.

{70}     Rejecting the corporate benefit theory would place North Carolina outside the mainstream and could result in class counsel shopping for other jurisdictions to hear cases involving North Carolina companies because of the fee restriction.  North Carolina does not blindly follow Delaware corporate law.

*First Union Corp. v. SunTrust, Inc.*, 2001 NCBC 09 (No. 01 CVS 10075, Mecklenburg Super. Ct. August 10, 2001) (Tennille, J.). However, it frequently looks to the wealth of experience and sound guidance found in the Delaware corporate law decisions when issues of first impression arise. In that light, it is instructive to note that the Delaware courts do recognize the corporate benefit theory and award fees based upon its application. Those cases will be discussed below. The Court believes North Carolina would be well served by following the majority rule and adopting the Delaware decisional framework.

In summary, public policy, the legislative intent expressed in N.C.G. S. § 57-7-46, and judicial economy and efficiency all dictate that the common law recognize that shareholders who file class actions in merger and acquisition cases and produce a real demonstrable benefit for shareholders should be permitted to apply for attorney fees and expenses. The trial court, moreover, in its discretion may award attorney fees based upon the contribution of counsel to the establishment of a benefit to the shareholders or the corporation.

B.

{71}    The Court next turns to the decisional framework to be applied in these types of cases, with the caveat that the framework is limited to merger and acquisition litigation. As indicated above, the great experience of the Delaware courts with these issues provides sound instruction on the best approach. Delaware, like North Carolina, carefully awards fees in common fund cases. *See, e.g., Goodrich v. E.F. Hutton Group, Inc*. 681 A.2d 1039 (1995). The common fund doctrine extends to creation of a common benefit. *See Sugarland Industries Inc. v. Thomas*, 420 A.2d 142 (Del. 1980). The *Sugarland* opinion describes the five relevant factors considered by the Delaware Courts in setting fees in common fund and common benefit cases. They include: (1) the results accomplished for the benefit of the shareholders, (2) the time, effort and expense of counsel spent in connection with the case, (3) the contingent nature of the fee, (4) the difficulty of the litigation, and (5) the standing and ability of counsel involved. *Id.* In *Painewebber R & D Partners II v. Centocor, Inc.*, C.A. 14405, 2000 No. Ch. LEXIS 12, at *7 (Del. Ch. Jan. 31, 2001), the Vice Chancellor, now Justice Steele, added three additional factors: the stage at which the litigation ended, the amount of the benefit that can fairly be attributed to the efforts of the requestor of the fees, and causation.

{72}    The five *Sugarland* factors encompass most of the factors previously considered by this Court and enumerated in Model Rule of Professional Conduct 1.5. *See Long v. Abbott Labs*, 1999 NCBC 10 (No. 97 CVS 8289, Mecklenburg Super. Ct. July 30, 1999) (Tennille, J.); *In Re Senergy,* 1999 NCBC 7 (No. 96 CVS 5900, New Hanover Super. Ct. July 14, 1999) (Tennille, J). The significant difference in the Delaware and North Carolina approaches generally is that North Carolina courts have more closely examined hourly rates than Delaware courts. However, the two standards come even closer when the Delaware courts are faced with determining attorney fees in cases involving non-monetary benefits or cases where the monetary benefit is difficult to determine. The nature of merger and acquisition litigation creates the need to examine the additional factors indicated by Justice Steele.

{73}    In the merger and acquisition arena, the Delaware Chancery Court has addressed the award of fees

where a non-monetary or therapeutic benefit was created and those situations in which the monetary benefit was not susceptible of determination. Chancellor Chandler described the therapeutic benefit case as follows: "In a corporate benefit case, there is no creation of a fund, yet a non-mandatory and "therapeutic" benefit, worthy of compensation, has been conferred . . .. [T]he doctrine holds, as with the common fund doctrine, that those who benefit should compensate whoever has caused the benefit." *In re Dunkin Donuts Shareholder Litigation*, C.A. No. 10825, 1990 Del. Ch. LEXIS 197 (Del. Ch. November 27, 1990). *See Painewebber,* 2000 Del. Ch. Lexis 12, C.A. No. 14405. (Jan. 31, 2000), *In re Golden State Bancorp, Inc.*, C.A. No. 16175, 2000 Del Ch. LEXIS 8, (Del. Ch. Jan. 7, 2000); *In re Diamond Shamrock Corp.*, C.A. No. 8798, 1988 Del. Ch. LEXIS 123, (Del. Ch. Sept. 14, 1988). In those cases, the Delaware courts have resorted to a "quantum meruit" approach in determining fees. Under the quantum meruit approach the actual performance of services and the value of those services in the market place becomes more important because the benefit value cannot be determined. Merger and acquisition cases also present another wrinkle not usually found in other cases: a determination of the extent to which the efforts of counsel and the class or derivative plaintiff caused the benefit — monetary and non-monetary — to occur. *See Centocor*, *supra*, *United Vanguard Fund, Inc. v. Takecare, Inc.* , 727 A.2d 844 (Del. Ch. 1998). Such cases drive the fee determination towards the quantum meruit approach because of the uncertainty in determining the cause of the benefit. The market frequently acts more quickly and with greater force than the legal system, and it often becomes difficult to parse the benefits derived from litigation from those bestowed by the marketplace. In the merger and acquisition arena, the legal system seldom dictates the result; rather, it acts to insure that the market operates freely and that directors fulfill their fiduciary duties to the shareholders.

{74}    In summary, in awarding attorney fees in merger and acquisition class action litigation, the trial court should be guided by the factors normally considered in setting fees in common fund cases. These factors should be augmented by consideration of the nature and value of any non-monetary benefit and a consideration of the causal connection between the efforts of counsel and the benefit achieved. In cases involving non-monetary benefits and cases where the contributions, causation, or value issues are not clearly determinable, the fee determination moves much closer to a quantum meruit determination. In making its determination, the trial court must consider the balance that must be maintained between offering acceptable incentives for shareholders to contest corporate action and the need to maintain the agency costs of such litigation at an acceptable level.

C.

{75}    The Court next turns to a consideration of the appropriate fee in this case.

{76}    <u>Amount Involved and Results Obtained</u>. Subsumed in this inquiry are the question of the value of the non-monetary benefit created and the contribution of counsel to the result. There was a non-monetary benefit created in this case. The invalidation of the sleeping pill freed the directors to fulfill their fiduciary duties in the event the shareholders of Wachovia rejected the merger with First Union. It thus eliminated

an element of coercion. The shareholders knew that the board would have to consider new offers if they rejected the First Union proposal. It eliminated a deal protection device that might have discouraged other potential bidders and made the SunTrust offer more viable. In retrospect, no additional bidder came forth; SunTrust did not change its offer, and the shareholders approved the merger. The invalidation of the sleeping pill turned out not to be a significant factor. However, the invalidation could have produced ramifications. There is value created any time that directors are prevented from abdicating their fiduciary responsibilities. However, this is a situation in which it is impossible to place a monetary value on the benefit obtained.

{77} Plaintiffs did not prevail in their attempt to invalidate the cross option provisions. The Court takes note of the fact that counsel abandoned that claim when SunTrust elected not to appeal. SunTrust may have had reasons for electing not to appeal unrelated to the general shareholders, and the fact that counsel abandoned the case after the SunTrust coattails disappeared has been considered by the Court.

{78} The Court has also considered the issue of causation and the contribution of counsel to the creation of the benefit. On these issues, the burden of establishing the value of the claimed benefit and the contribution of counsel rest with the plaintiffs as proponents of the fee application. *See In Re Diamond Shamrock Corporation,* C.A. No. 8798, 1988 Del Ch. Lexis 123 (Del. Ch. Oct. 3, 1988). Counsel for SunTrust clearly manned the laboring oar in this case. Class counsel were basically on standby in the event that SunTrust withdrew its offer. Class counsel continued to "stand by" after SunTrust elected not to proceed with an appeal, even though the class position and interest in the cross option provisions might have been different from those SunTrust. The Court does not mean to suggest that class counsel in these cases duplicate the effort of counsel for the third party bidder, particularly in discovery. The Court specifically discouraged such duplication. It simply recognizes the reality that the risks and time commitment required of class counsel are significantly reduced when a third party bidder takes primary responsibility for the difficulty and expense of the litigation. The role of class counsel from a causation or contribution standpoint is not the same as it would be if class counsel had primary responsibility. This record does not reflect any position taken by class counsel that differed markedly from those taken by SunTrust. There was no seperate or additional contribution of class counsel in this instance. The fact that class counsel participated served a salutary purpose in that SunTrust could have chosen to withdraw from the contest for Wachovia at any time for its own business reasons. Absent the efforts of class counsel, the shareholders would have been left without representation if that had occurred. Essentially plaintiffs counsel served in a standby or monitoring role.

{79} <u>Novelty and Difficulty of the Issues Presented.</u> Both of the deal protection devices raised difficult issues because they represented untested extensions of previously used protective measures. Counsel for the Wachovia Board of Directors informed them in the course of their considerations that the cross options were at the outer edge of acceptable deal protection devices. The extension of the contract termination date beyond the merger vote was also an untested deal protection device. As such, both raised new issues

for determination by the Court. There was certainly no assurance that plaintiffs would prevail on any issue in this case. Likewise, there were no appellate decisions addressing the standard of review under North Carolina law. The questions raised by the dearth of appellate cases and the unique language in the North Carolina statute raised novel and complex issues. SunTrust took the lead in addressing those issues. Where merger counsel push the envelope in employing deal protection devices, it is hard for them to argue the issues are not new or difficult.

{80}     Preclusion of other matters. While the typical merger and acquisition case is difficult to manage because of the time pressures involved, this case was not out of the ordinary in that respect. All out of state counsel specialized in this type of litigation and have practices geared to handle these cases. The attorney's expertise is reflected in the individual hourly rates. This matter was unlikely to preclude any of plaintiffs' counsel from taking on other matters.

{81}     Customary fee charged in the locality for similar legal services and whether the fee is fixed or contingent. In this matter, plaintiffs' counsel were unlikely to be compensated unless they prevailed in setting aside at least one of the deal protection devices. In a third party bidder case the risks to class counsel are reduced because the primary burden and expense is born by the bidder. So while the fee is at risk, the amount of the risk is reduced substantially by the presence of the third party bidder. The amount of time and expense required of class counsel is substantially less than it would be if they carried the primary burden of the litigation. The fact that the fee was contingent justifies consideration of a premium for taking the risks. The Court finds the hourly rates proposed by counsel as their lodestar already contained a risk premium.

{82}     Time and labor required. The appointment of lead counsel serves several purposes. It is the primary means by which courts can attempt to control the litigation agency costs in this type litigation while preserving the shareholders' ability to sue as a group. Lead counsel have the obligation to insure the efficient and economical pursuit of the shareholders claims. It is their responsibility to manage the cost effectiveness of the representation. It is unacceptable for lead counsel to simply allocate functions to satisfy the fee demands of other counsel. It is their responsibility to see that the work is performed in the best way, not to spread the fee.

{83}     It is also lead counsel's responsibility to present a complete comprehensive fee request. Lead counsel is required to exercise some judgment in making the fee application. They are in the best position to judge the contribution made by various lawyers to the case and apprise the court of that contribution. It is part of their job as lead counsel. It is unacceptable to simply ask anyone who wants a fee to submit their time records for the Court to take its time to review. The first cut should be made by lead counsel who should then present to the court a consolidated picture of the effective class representation. There was no first cut in this case. In the future, class counsel should present a fee request that details work done by them or at their request and segregate any other work and explain to the court why that work merits compensation. The Court had to request detailed time records from the firms. The trial court is not bound

by fee agreements between counsel or their agreements for allocation of the work.  The trial court has to balance the competing requirements of the system and insure that proper incentives exist and that the litigation agency costs do not get out of line.

{84}     The Court applied certain general rules in reviewing the time and expense reports. If no detailed time records are available, the fee request is ignored.  The Court will not compensate lawyers who filed cases and were not appointed lead counsel merely because they filed a complaint. To reward anyone who rushed to the courthouse and filed a complaint would encourage proliferation of lawsuits and unnecessarily increase litigation agency costs.  After lead counsel is appointed, only work performed at the direction of lead counsel or the court will be considered.  Lawyers will not  be compensated by the court for "following" the case.  No compensation will be paid for preparing fee petitions. No work will be considered on cases in other jurisdictions.  Duplicative work will not be considered. Only work done in cases consolidated before this court will be considered. Work unrelated to the issues in the case and unused by lead counsel will not be compensated.  Generally, work performed after plaintiffs elected not to appeal the Court's ruling on the motion for preliminary injunction has been ignored.

{85}     There are certain general criticisms of the fee requests submitted. For the most part, counsel seem to have been indiscriminate in their fee requests.  All counsel appeared to have worked a premium into their hourly rate request already, and the Court has considered that premium in setting the fees herein. No additional premium was thus warranted.  The fee information was incomplete, and it was often difficult to tell what work the lawyers were doing and for whom. There were a lot of "conferences" and much "reading" that led to excessive billing.  The Court's review of the time records showed 23 *pages* of entries for conferences.  *See* Appendix A.   Where work was done that did not involve the actual taking of depositions or the preparation of briefs or motions, the work appeared to be superfluous.  Lawyers who were not lead counsel were working on their own, even though lead counsel had been appointed. That work should be billed to their client.

{86}     More specifically, the Court's review of the fee and expense requests from co-lead counsel found those requests to be reasonable and compensable, with the exception of time billed for the fee request.  It appears that lawyers from Chitwood & Harley, Clark, Bloss & Wall, and McDaniel covered some depositions and should be compensated for their participation.  There appeared to be some other work that might have contributed to the overall effort, but it was small. Where a named partner works four hours in a matter and wants a $2,400 fee, it is hard for the Court to see the contribution at that level.  It appears to be padding and results in a loss of credibility.   Attached hereto as Appendix A are notes from the Court's review of the fee requests, which may prove beneficial to co-lead counsel in allocating the fee awarded. The Court notes for the benefit of co-lead counsel that Kirby McInerny & Squire did not file detailed time records.  The request from Finkelstein, Thompson and Loughran is perhaps the most egregious. This firm billed under attorney time for an "analyst" report that the Court supposes was prepared by someone in their office.  This report does not appear to have been reviewed by co-lead counsel and was only looked at by

one lawyer outside the firm for fifteen minutes. The analyst worked on the report for 19 hours after the Court's ruling on the motion for preliminary injunction. In total, the analyst spent 428.4 hours on the report (42 days at 10 hours a day), and the firm requests a fee of $124,236 for his work. The work bore no reasonable relation to the challenge to the deal protection devices at issue in the lawsuit. Other attorneys spent 16 hours meeting with the analyst about the report. These attorneys spent 11 hours reading message boards and the news. No attorney or even a staff member at the firm attended a deposition or a hearing. This is the type of fee request that causes the courts the greatest concern in trying to preserve shareholders' abilities to sue while keeping the costs of such litigation rational.

{87}	Lead counsel in class action cases are expected to lead. They are responsible for the effective, efficient and economical management of the litigation on behalf of the class. Lead counsel should stand behind every dollar requested in a fee application and explain to the court why the services for which compensation are sought were necessary. They should not expect the court to plow through pages of time records to determine the contributions of attorneys in a case. The lack of sound time records certainly delays ruling on the fee application. In general, there should be little in the way of time and expenses from counsel who have not been appointed lead counsel.

{88}	<u>Requisite skill</u>. The Court finds that lead counsel possessed and utilized the requisite skill and ability in handling this matter.

## SUMMARY

{89}	The Court finds that there was already a risk premium included in the lodestar fee request. It accepts the lodestar fee and expense application of co-lead counsel except for time spent in the fee application. The Court also finds that there was additional compensable work by other counsel in the amount of $50,000 and additional expenses of $5,000. Thus, the Court, in its discretion, awards attorney fees of $325,000 and expenses of $36,000. This amount is to be paid to co-lead counsel for distribution by them in their discretion with the guidance contained in this order. The Court notes that this award is somewhat in excess of the average fee award of $273,586 in "therapeutic" benefit cases in Delaware. *See Louisiana State Employee's Retirement System v. Citrix Systems, Inc*, C.A. No. 18298, 2001 Del Ch. LEXIS 115, (Del. Ch. Sept. 17, 2001). The comparison with similar cases supports this Court's view that the majority of the fee requests by non-lead counsel in this case were excessive and unjustified.

## CONCLUSION

{90}	The standard for determining fee awards in shareholder litigation set forth above provides a consistent theoretical framework for the determination of fee awards in such litigation whether in the context of a class action or a derivative suit. The framework places primary responsibility on the trial court to insure that the transaction costs associated with shareholder litigation are allocated so as not to create unnecessary and inefficient litigation costs. The allocation of costs should instead provide incentives to shareholders and their counsel to pursue remedies for perceived failures of officers and directors to protect shareholder interests. The framework provides the trial court and counsel with flexibility to decide which litigation mechanism works best in a particular case.

{91}	The Court is cognizant of the significant policy issues raised by the opinion and the need for guidance from the appellate courts on the questions raised. The Court believes that this is an ideal matter for consideration by the North Carolina Supreme Court on a petition for discretionary review.

It is therefore ORDERED:

1. Defendants shall pay to co-lead counsel the sum of $361,000 for fees and expenses in connection with their representation of the class of shareholders in this case, such payment to be made on or before January 15, 2004.

2. Co-lead counsel shall distribute that amount among counsel in their discretion with the guidance contained in this order.

3. The fee request of the Brualdi firm and Donaldson and Black is denied.

4. The Harbor Finance case is dismissed.

This 19th day of December 2004.

---

[1] Robert B. Thompson and Randall S. Thomas, *Shareholder Litigation: Reexamining The Balance Between Litigation Agency Costs and Management Agency Costs* (Columbia Center for Law and Economics, Working Paper, December 2002).

[2] *Id*. at 2. Litigation is significant to good governance because shareholders only have three key rights: to vote, to sell and to sue for breach of fiduciary duty.

[3] Sarbanes-Oxley Act of 2002; Pub. L. No. 107-204; 116 Stat. 745.

[4] *In re Dunkin Donuts Shareholder Litigation*, C.A. No 10825, 1990 Del. Ch. LEXIS 197 (Del. Ch. November 27, 1990).

[5] *First Union Corp. v. SunTrust, Inc*., 2001 NCBC 9 (No. 01 CVS 10075, Mecklenburg Super. Ct. August 10, 2001) (Tennille, J.); Robert Thompson*, Preemption and Federalism in Corporate Governance: Protecting Shareholder Rights to Vote, Sell and Sue*, 62 LAW & CONTEMP. PROB. 213 (1999). These rights were also fully explored by Robert Thompson and Gordon Smith in a presentation at the Michigan Law School in 2001 entitled "Toward a New Theory of the Shareholder Role." *See also* Robert B. Thompson & D. Gordon Smith, *Toward a New Theory of the Shareholder Role: "Sacred Space" in Corporate Takeovers*, 80 TEX. L. REV. 261 (2001).

[6] *See* discussion *supra* Part II.A paragraphs 32-33.

[7] The following five firms attended depositions on behalf of the Shareholders: Wilson & Iseman, LLP (five depositions), Chitwood & Harley (four depositions), Abbey Gardy, LLP (two depositions), McDaniel & Anderson, LLP (f/k/a McDaniel, Anderson & Stephenson) (2 depositions), Clark, Bloss & Wall, LLP (f/k/a Clark, Bloss & McIver, LLP) (one deposition). Harvey Greenfield attended five depositions but has passed away since the conclusion of the litigation, and his firm did not join in this fee

request.

[8] The Court notes that the demand requirements under Delaware law are different and make using the derivative action easier. Even given that fact, the use of class actions is more prevalent in Delaware than the use of derivative actions when deal protection devices are at issue.

[9] The alleged failure to clearly specify the action required by the board is treated below.

[10] *See Greene v. Shoemaker*, 1998 NCBC 4 (No. 97 CVS 2118, Wilkes Super. Ct. October 24, 1999) (Tennille, J.).

[11] *See* Thompson & Thomas, *supra* note 1, at 13. "Derivative actions are also subject to several procedural protections against litigation agency costs, including: the contemporaneous ownership requirement, posting security for expense statutes, and most importantly, the demand requirement." North Carolina has elected to eliminate the futility test and require demand under all circumstances and does not require posting security for expenses.

[12] *Winters v. First Union*, 2001 NCBC 8 n.1 (No. 01 CVS 5362, Mecklenburg Super Ct. July 13, 2002) (Tennille, J.).

[13] *First Union Corp. v. SunTrust, Inc.*, 2001 NCBC 9 (No. 01 CVS 10075, Mecklenburg Super. Ct. August 10, 2001) (Tennille, J.); *In re IXC Communs. Shareholders Litig. v. Cincinnati Bell, Inc.*, C.A. No. 17324, 1999 Del. Ch. LEXIS 210 (Del. Ch. Oct. 27, 1999).

[14] In merger and acquisition cases, the class action mechanism may offer the best opportunity for judicial management and cost control. Trial courts should apply the tools available to positively affect reductions in cost without destroying the incentive to shareholder counsel.
These tools include selecting class representatives with real and significant interests in the litigation and the selection of counsel based on the quality of the complaint rather than the first party to file. The Court has greater control over the lead counsel and fee approval. No delays occur waiting on board action on a demand. The creation of subclasses can be used if necessitated. Greater control can be asserted over professional plaintiffs. Class actions may facilitate settlements better than derivative actions. All these tools are lost if artificial limitations on fee awards discourage class actions.

[15] *See* Thompson & Thomas, *supra* note 1 at 26. While Delaware still recognizes demand futility, thus making it easier to file derivative actions, the class action mechanism is the most frequently used means of contesting board action in connection with mergers and acquisitions. There are rational policy reasons underlying that fact. Those policy considerations apply to determine whether North Carolina would adopt a "corporate benefit" test.

[16] *See* Thompson & Thomas, *supra* note 1, at 43 (Table 13: Most Frequently Named Plaintiffs in Fiduciary Duty Suits).

[17] *See* Thompson & Thomas, *supra* note 1, at 70.

[18] *See* Thompson & Thomas, *supra* note 1, at 44.

[19] When examined about the connection between Crandon Capital and Harbor Finance at oral argument, counsel for Harbor Finance could not answer the court's questions about the connection. *See* transcript of April 9, 2003 hearing page 30.

[20] Crandon Capital Partners has itself been involved in over 25 breach of fiduciary duty cases according to the Court's research.

[21] The PLSA limits the number of suits that can be filed by a single plaintiff under the federal securities laws. 15 USCS § 78u-4 (2003).

[22] Documents filed in the following cases may be accessed on this Court's website www.ncbusinesscourt.net: *Breakwater Partners v. Gillings, et al*, 02 CVS 5355 (Durham County), Consol. Civil Action *In Re Quintiles Transnational Corp. Shareholders Litigation,* 02 CVS 5348 (Durham County).

[23] N.C.G.S. § 55-7-46 (2003).

[24] Defendants protest that because class counsel waited too long to ask for a fee, all the shareholders of the New Wachovia will bear the burden of such a fee award. The litigation was pending when the merger vote occurred. The results had been fully disclosed. No knowledgeable shareholder would be surprised by the fee application. The amount of the fee requested and the amount actually awarded could not be considered material. The fee award will not affect the income statement of the New Wachovia in any discernible way. The time for appeal had not expired even though this Court had entered its Order at the time of the merger. The case was not over. To require a fee application to be filed before the merger vote would in most instances be counterproductive and promote too early an exit by shareholder counsel. A pre-vote application would not be good policy. A different argument might exist where the fee request would be material to the financial condition of the surviving company.